IN THE SUPREME COURT OF THE STATE OF IDAHO

**Docket No. 37472**

IN THE MATTER OF JANE DOE, JANE
DOE I, CHILDREN UNDER EIGHTEEN
YEARS OF AGE.

-----------------------------------------------------------

IDAHO DEPARTMENT OF HEALTH &
WELFARE,

    Petitioner-Respondent,

v.

JANE DOE II,

    Respondent-Appellant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, September 2010 Term

2010 Opinion No. 121

Filed: November 26, 2010

Stephen W. Kenyon, Clerk

---

Appeal from the Magistrate Court of the First Judicial District of the State of Idaho, Kootenai County. The Honorable Scott Wayman, Magistrate Judge.

The judgment of the magistrate court is affirmed.

Daniel G. Cooper, Coeur d'Alene, for appellant.

Honorable Lawrence G. Wasden, Attorney General, Boise, for respondent.

---

J. JONES, Justice.

Jane Doe appeals the magistrate court's judgment terminating her parental rights to her two children. We affirm.

## I.
### Factual and Procedural Background

In September of 2005, the Idaho Department of Health and Welfare (the Department) received information regarding possible environmental and safety concerns in Jane Doe's home, where she lived with her husband and three children (J.S., B.S., and J.T.). At the time of the referral, Doe's youngest child, J.S., was eleven months old, B.S. was two years old, and J.T. was

1

seven years old. Doe's husband is the biological father of the two younger children, but is not the biological father of Doe's oldest child.

In response to the referral, the Department, along with law enforcement, conducted a home visit during which they observed feces, clothing, mold, and rotting food strewn throughout the front room of Doe's house. Thereafter, the Department conducted another visit to the home where they observed similar conditions, including extreme clutter, spoiled food on the floor, and old diapers, clothing, and garbage throughout the home. During the same visit, the Department found B.S. with feces smeared on her leg and J.S. with a metal wire in her mouth.

Following these visits, Doe and her husband entered into a voluntary agreement with the Department whereby the Department agreed to provide services to Doe and her family in a coordinated effort to remedy the unsanitary and unsafe condition of the home. The children were allowed to remain in the home during this time. The Department worked with Doe and her husband pursuant to the voluntary agreement for approximately six months. During this period, the condition of the home improved on a few occasions, but generally remained unsanitary and unsafe for the children. For example, the Department continued to observe dirty dishes and rotting food in the kitchen and during one visit, observed pop cans, beads, metal wiring, and pieces of plastic and metal on the floor of the home. On another occasion, the Department found a butcher knife on the floor. Additionally, during more than one visit, there was food in the same area as the garbage and the children were unclothed, dirty, and had runny noses that had not been cleaned. Finally, at some point during the six-month period, the Department received information that Doe and her husband were going to be evicted from their home and that Doe's oldest child had been absent from school for a period of time without homeschooling.

As a result of the unsanitary and unsafe condition of the home, the State filed a petition claiming the children fell within the purview of the Child Protective Act (CPA) and asked the court to vest legal custody of the children in the Department. The petition alleged the children had suffered from neglect and/or an unstable home environment. In April of 2006, Doe stipulated that her children fell within the purview of the CPA and agreed to allow the Department to take legal custody of all three children. Doe's two younger children, J.S. and B.S., were placed in foster care, while her oldest child, J.T., was placed with her biological father. J.T.'s biological father eventually obtained sole legal and physical custody of her, and she was subsequently dismissed from the child protection case.

After Doe's two younger children were placed in foster care, Doe and her husband were directed to comply with a court-ordered case plan in an effort to regain custody of their children. The Department maintained continuous contact with Doe and her husband and monitored their compliance with the case plan. During this time, Doe and her husband moved to several different residences, and the Department continued to conduct visits at each new place. The Department also issued written notices to Doe and her husband detailing the necessary steps to make the living arrangements suitable for the children.

While the children were in foster care, Doe and her husband were allowed weekly supervised visits, and they consistently attended these visits and interacted with the children. Doe and her husband also celebrated birthdays and holidays with the children and gave them gifts on these occasions. At some point, the Department learned that Doe and her child, J.S., both suffer from Von Willebrand disease, which is a blood disease that causes frequent bruising and affects the blood's ability to clot. After receiving this information, the Department made efforts to inform the foster parents about the disease.

In January of 2007, the magistrate court held a review hearing. The Department and the guardian ad litem appointed for the benefit of the children both filed reports, indicating that Doe and her husband had not been complying with the case plan and had failed to maintain a sanitary and safe household for the children. The Department also indicated that the children were doing very well and making significant progress while in foster care. Following the review hearing, the children remained in the custody of the Department. Thereafter, the court held a permanency hearing and ultimately approved a permanency plan for the termination of parental rights. Pursuant to the magistrate court's order, the Department filed a petition to terminate parental rights.

In May of 2008, the magistrate court held a trial regarding the Department's petition to terminate parental rights. At the conclusion of the trial, the court dismissed the Department's petition and ordered the children to be transitioned back into Doe's home subject to the Department's protective supervision. Pursuant to the court's order, Doe and her husband were to continue to clean and repair the home in order to keep it safe for the children and to cooperate with both announced and unannounced visits from the Department and the guardian ad litem.

After the children were placed back into the home, both the Department and the guardian ad litem conducted several home visits. During these visits, the guardian ad litem observed the home in a cluttered state with clothing and trash on the floor and dirty dishes in the sink. Inside one

of the children's bedrooms, she saw food ground into the carpet and noticed there was no screen on the window. She also found unsecured flashing with rough metal edges on the outside of the home, along with automobile seats, automobile parts, and other unusable items spread throughout the property. Additionally, one of the social workers for the Department also observed stacks of laundry, overflowing ashtrays, unsanitary bathrooms, old food in the kitchen within the children's reach, alcohol in the kitchen, and feces on the floor near the children's bedrooms. The children were dirty and appeared as if they had not been bathed, and the water in Doe's house had been shut off.

Less than seven weeks after being reunited with Doe, the children were again removed from the home based on the unsanitary and unsafe living conditions. On the day the children were removed, the Department also learned that Doe and her husband were moving into a new apartment where they would be receiving housing assistance. The Department had paid the security deposit on behalf of Doe and her husband to assist them in obtaining the apartment, but was not aware of the specific date on which the move would take place.

The court subsequently held a shelter care hearing and once again vested custody of the children in the Department. Shortly after the children were placed in the Department's custody, Doe's visits with the children were reduced from weekly visits to biweekly visits based on a recommendation by the children's counselor. The counselor noted that the children had acted out and displayed reactive behaviors, such as wetting, soiling, whining, and crying, following a previous visit with Doe and her husband. According to the counselor, during the visit Doe had told the children she was going to get them back and that they would be home soon, which caused the acting out and reactive behaviors.

The court later approved a second case plan with the overall goal of reunifying Doe with her children. Pursuant to this case plan, Doe was required to (1) provide the Department with a schedule of household cleaning tasks and maintain a clean home, (2) take a class on sanitary food preparation and obtain a food handler's permit, (3) cooperate with announced and unannounced visits by the Department to monitor her progress in maintaining a clean home, (4) contact a psychosocial rehabilitation agency to assist her with making the changes necessary to provide a safe and clean home for her children, (5) obtain a psychological evaluation and comply with any treatment recommendations resulting from the evaluation, (6) attend and complete an eighteen-week parenting class, (7) write out the developmental tasks of each child according to their age and

4

develop discipline strategies for each child pursuant to their current developmental stage, (8) attend family counseling with the children if they were to be transitioned back into the home, (9) provide age-appropriate activities to engage the children in play during supervised visits, (10) attend and complete a budgeting class, (11) develop a monthly budget and demonstrate an ability to comply with the monthly budget, (12) apply for any services that would provide her with financial assistance, and (13) contact Vocational Rehabilitation to find out if she would qualify for assistance in learning a new trade.

In February of 2009, the court held another review hearing. The guardian ad litem filed a report indicating that Doe had not been complying with the case plan and had not been cooperating with visits from the guardian ad litem. The report also indicated the children were happy and well-cared for in their foster home, had expressed a desire to remain there, and were anxious to have the situation resolved. The Department also filed a report for the review hearing, noting that Doe had not been complying with the case plan and the children were thriving in foster care. Both the guardian ad litem and the Department recommended that the court consider terminating parental rights. The Department also indicated that the current foster family was willing to provide a permanent home for the children if they were to come up for adoption. At the close of the review hearing, the court granted the Department permission to move toward terminating parental rights without further efforts to reunite the family.

As a result of the court's order, the Department filed a second petition to terminate parental rights, alleging that Doe and her husband (1) had abandoned the children, (2) had neglected the children, (3) had neglected the children by failing to comply with the case plan, and (4) were unable to discharge parental responsibilities and that such inability would continue for a prolonged indeterminate period and would be injurious to the health, morals, or well-being of the children. The court held a trial on the Department's second petition. At the time of the trial, the children had been in foster care for approximately three and a half years.

At trial, the court heard testimony from the children's current foster parents, the children's previous foster mother, the guardian ad litem, two social workers from the Department, Doe's prior landlord, and Doe and her husband. Additionally, the court admitted several exhibits including photographs of the condition of Doe's home before the children were first removed, photographs of the condition of the home before the children were removed the second time, and photographs of the condition of the new apartment where Doe and her husband were planning to move. The

5

other exhibits included the second case plan, child support records, a psychological evaluation for both Doe and her husband, the trial transcript from the prior termination proceedings, and letters from the Department describing the tasks that needed to be completed to make the home safe and sanitary.

At the close of the trial, the magistrate court made oral findings on the record granting the Department's petition for termination of parental rights. Specifically, the court found neglect on the ground that Doe and her husband had failed to comply with the court-ordered case plan. Additionally, the court found that it was in the best interests of the children to terminate parental rights because Doe and her husband had been unwilling and unable to provide the children with a safe and sanitary home despite reasonable efforts by the State.[1] The court rejected the other allegations in the petition.

Doe appeals the magistrate court's decision to terminate her parental rights arguing that while there were elements of the case plan that she did not comply with, the court erred in terminating her parental rights because there was no evidence that either child suffered harm or was likely to suffer harm from the environmental conditions within her home. On the other hand, the Department argues that the definition of neglect under Idaho law does not require a finding of actual harm and there is substantial, competent evidence in the record to support the magistrate court's finding of neglect based on Doe's willful failure to comply with the case plan.

## II.
### Issue on Appeal

I.      Whether there is substantial, competent evidence in the record to support the magistrate court's decision to terminate Doe's parental rights.

## III.
### Discussion
#### A.      Standard of Review

Grounds for termination of parental rights must be shown by clear and convincing evidence because each parent has a fundamental liberty interest in maintaining a relationship with his or her child. *Santosky v. Kramer*, 455 U.S. 745, 769 (1982); *In re Aragon,* 120 Idaho 606, 608, 609, 818 P.2d 310, 312, 313 (1991). "Clear and convincing evidence is generally understood to be '[e]vidence indicating that the thing to be proved is highly probable or reasonably certain.'" *In re*

---

[1] While the parental rights of the children's father were also terminated at this time, this appeal involves only the termination of Jane Doe's parental rights.

*Adoption of Doe,* 143 Idaho 188, 191, 141 P.3d 1057, 1060 (2006) (quoting *Black's Law Dictionary* 577 (7th ed.1999)). On appeal, this Court will not disturb the magistrate court's decision to terminate parental rights if there is substantial, competent evidence in the record to support the decision. *State v. Doe*, 143 Idaho 343, 345, 144 P.3d 597, 599 (2006). "Substantial, competent evidence is 'such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. at 345–46, 144 P.3d at 599–600 (quoting *Folks v. Moscow Sch. Dist. No. 281*, 129 Idaho 833, 836, 933 P.2d 642, 645 (1997)). This Court is required to conduct an independent review of the magistrate court record, but must draw all reasonable inferences in favor of the magistrate court's judgment because the magistrate court has the opportunity to "observe witnesses' demeanor, to assess their credibility, to detect prejudice or motive and to judge the character of the parties." *In re Aragon*, 120 Idaho at 608, 818 P.2d at 312.

## B. Grounds for Termination

In this case, the magistrate court terminated Doe's parental rights on the ground of neglect and on a finding that it was in the best interests of her two children to terminate those rights. Statutory grounds for termination of parental rights under Idaho Code section 16-2005 include: (a) abandonment; (b) neglect or abuse; (c) lack of a biological relationship between the child and a presumptive parent; (d) inability to discharge parental responsibilities for a prolonged period, which will be injurious to the health, morals, or well-being of the child; or (e) incarceration for a substantial period of time during the child's minority. I.C. § 16-2005. Upon finding a statutory ground for termination, the court must also find that it is in the best interests of the child to terminate the parent-child relationship. I.C. § 16-2005(1). Both findings must be established by clear and convincing evidence.

### 1. Neglect

The magistrate court found that Doe neglected her children because of her failure to comply with the court-ordered case plan. Pursuant to Idaho Code section 16-2002(3)(b), neglect occurs when "[t]he parent(s) has failed to comply with the court's orders in a child protective act case or the case plan, and reunification of the child with his or her parent(s) has not occurred within the time standards set forth in section 16-1629(9), Idaho Code." I.C. § 16-2002(3)(b). The time standards under Idaho Code section 16-1629(9) provide "[t]here shall be a rebuttable presumption that if a child is placed in the custody of the department and was also placed in out of the home care for a period not less than fifteen (15) out of the last twenty-two (22) months

7

from the date the child entered shelter care, the department shall initiate a petition for termination of parental rights." I.C. § 16-1629(9). Such a presumption may be rebutted if the court finds that filing a petition to terminate parental rights would not be in the best interest of the child or the Department has not made reasonable efforts to reunite the child with his or her family. *Id*. The State in each case is required to make reasonable efforts to reunite the family because the overarching goal behind the CPA is to "preserve, protect, enhance, and reunite the family relationship." I.C. § 16-1601.

On appeal, Doe argues that the magistrate court erred in finding neglect because there was no evidence presented at trial to indicate the children suffered actual harm or were likely to suffer any harm due to the condition of Doe's home. However, contrary to Doe's argument, Idaho Code section 16-2002(3)(b) does not require the court to make a finding of actual harm or a risk of harm before finding neglect. *See* I.C. § 16-2002(3)(b); *In Interest of Cheatwood*, 108 Idaho 218, 220, 697 P.2d 1232, 1234 (Ct. App. 1985) ("[N]othing in the statutory definition of 'neglect' suggests that a child must suffer demonstrable harm before the parent-child relationship can be terminated. . . . The termination statutes of this state exist not merely to alleviate harm but to prevent it.").[2] Instead, the plain language of the statute only requires the court to find the parent has failed to comply with the court's orders or the case plan and that reunification has not occurred within the statutory time frame in order for the definition of neglect to be satisfied. I.C. § 16-2002(3)(b).

In this case, the magistrate court specifically found neglect on the ground that Doe and her husband had failed to comply with the case plan. Additionally, the magistrate court found that at the time of the trial, the children had been out of the home for approximately forty-two months, which indicates that reunification had not occurred within the time standards set out in Idaho Code section 16-1629(9). In reaching this conclusion, the magistrate court engaged in a detailed analysis of each task Doe was ordered to complete pursuant to the case plan and the progress she had made on each one. More specifically, the court found Doe failed to: (1) provide the Department with a schedule of household chores, (2) complete a food safety course, (3) cooperate with visits from the Department, (4) contact a psychosocial rehabilitation agency, (5)

---

[2] While the Court of Appeals was dealing with the statutory definition of neglect under Idaho Code section 16-2005(b), which defines neglect as "a situation in which the child lacks parental care necessary for his health, morals and well-being," the plain language of the statutory definition of neglect in Idaho Code section 2002(3)(b) similarly does not require a finding of any actual harm.

follow the recommendation in her psychological evaluation, (6) complete an eighteen-week parenting course, (7) write out a list of developmental tasks for each child, and (8) come up with a budget. The court also found Doe only partially complied with the task in the case plan requiring her to plan and provide age-appropriate activities for her children to engage them in play during supervised visits and the task requiring her to apply for financial assistance.

At trial, Doe offered several excuses for why she had failed to comply with parts of the case plan, testifying that she was still working on some of the tasks at the time the children were removed from the home, she did not qualify for psychosocial rehabilitation services, and she had previously taken different parenting classes. The magistrate court specifically rejected Doe's justifications, noting that the tasks Doe claimed she was still working on were simple tasks that would take relatively little time to complete. The magistrate court also found that even if Doe was truly unable to qualify for services she was required to obtain pursuant to the case plan, she should have contacted the Department to modify the plan. Finally, the court pointed out that Doe had signed the case plan, knew of its terms, and had simply been unwilling to comply.

We find that there is substantial, competent evidence in the record to support the magistrate court's finding of neglect on the ground that Doe had failed to comply with the case plan. The magistrate court's conclusion is supported by testimony at trial from the Department social worker who worked with Doe and her family for approximately two years. She testified to precise aspects of the case plan that Doe and her husband failed to comply with, as well as the steps the Department had taken to assist Doe and her husband in complying. Additionally, the reports the Department and the guardian ad litem submitted to the court for the various review hearings similarly indicate that Doe consistently failed to comply with the case plan. Finally, Doe does not offer any argument on appeal that she actually complied with the case plan, and in fact concedes that there are elements of the plan she failed to complete. Therefore, there is substantial, competent evidence in the record to support the magistrate court's finding of neglect on the ground that Doe failed to comply with the court-ordered case plan.

### 2.    Best Interests of the Children

Doe's argument on appeal focuses mainly on the lack of actual harm to the children. She does not provide this Court with a discussion of whether the decision to terminate her parental rights was in the best interests of the children. However, as noted previously, Doe argues that "[a]bsent evidence that the children suffered harm or were likely to suffer harm from the

environmental conditions within Jane Doe's home, there existed no compelling state interest to terminate her parental rights." This statement in Doe's brief may be interpreted to include an argument that terminating her parental rights was not in the best interests of the children because there is no evidence that the children suffered harm or were likely to suffer harm as a result of the condition of her home.

As previously mentioned, there is no requirement in Idaho law that the court find actual harm before determining that terminating parental rights is in the best interests of the children. Rather, once the State is aware of circumstances indicating a child faces potential harm, it should not have to wait to intervene until that child suffers actual harm or illness, but rather should act to prevent it.[3] The magistrate court, in making its decision, specifically noted the absence of any evidence of actual injury or illness to the children, but found there was the potential for illness or injury given the environment in which the children were living. The court fully addressed the issue in its ruling when it stated:

> I couldn't find any case that requires that there actually be an illness or injury. And that makes a certain amount of sense. When you see a dangerous condition, do you want to let a child get into it and hurt themselves before you take steps to prevent them from being hurt? No. You want to try and take steps to prevent them from being hurt. Prevent them from being ill. Prevent them from being injured. And that's what this case turned into. We don't have the situation where children fortunately were never hospitalized or anything like that. That could have happened, but it didn't. And I'm not gonna speculate as to what may have happened. But it makes no sense to allow the children to live in an environment where they can get sick and where they can be hurt. And that's the environment they were living in.

Thus, while termination cases involving no evidence of actual harm to the children are certainly more difficult to decide, such evidence is not required before the court may terminate parental rights. Consequently, we must determine whether there was substantial and competent evidence in the record to support the magistrate court's conclusion that it was in the best interests of the children to terminate Doe's parental rights because of her unwillingness and inability to provide

---

[3] Such a policy is also supported by the law of other jurisdictions. *See*, *e.g.*, *G.A.C. v. State ex. rel. Juvenile Dep't of Polk Cty.,* 182 P.3d 223, 230 (Or. App. 2008) (noting that the termination statute "authorizes the state to intervene not only when children have suffered actual harm, but to protect children from a substantial risk of harm"); *Asjes v. Texas Dep't. of Protective and Regulatory Servs.*, 142 S.W.3d 363, 370 (Tex. App. 2004) (finding that in order for a parent's conduct to be relevant to the question of whether parental rights should be terminated, the conduct does not necessarily have to result in actual harm to the child).

her children with a safe and sanitary home, even though the children did not suffer any actual harm.

While this case is not as clear-cut as other termination cases that have come before this Court, we find that the evidence in the record concerning the conditions of Doe's home constitutes substantial and competent evidence to support the magistrate court's finding that Doe exposed her children to dangerous and unsanitary conditions that put her children at risk of harm. The Department first got involved with Doe and her family upon receiving information regarding possible environmental and safety issues in the home. The Department worked with Doe for approximately six months to remedy the unsanitary and unsafe conditions in her home, but Doe failed to maintain her home in a condition that was safe for the children. As a result of the continuing unsanitary condition of the home, the children were removed and placed in foster care. Doe was then given a second chance, and the children were returned to her home. It was less than seven weeks before the children were removed from the home for a second time as a result of the unsanitary condition of the home. The State presented substantial evidence at trial relating to the condition of Doe's home after the children were returned. With regard to the inside of the home, the testimony from the guardian ad litem and one of the social workers from the Department indicated that there was clothing and trash on the floor, dirty dishes in the sink, overflowing ashtrays, unsanitary bathrooms, old food in the kitchen within the children's reach, alcohol in the kitchen, and feces on the floor near the children's bedrooms. Additionally, the testimony indicated that the children were dirty and appeared as if they had not been bathed for a significant period of time. With regard to the outside of the home, there was unsecured flashing with rough metal edges, along with automobile seats, automobile parts, and other unusable items spread throughout the property, all of which presented a danger to the children. J.S., who suffers from a blood disease affecting her body's ability to clot blood, was particularly at risk due to these conditions. Additionally, the photographs admitted at trial corroborate the magistrate court's view of the conditions of the home.

At trial, Doe argued that she loves her children and has consistently maintained a relationship with them while they were in foster care. Doe also argued that there was no clear standard for what was required in order to maintain a clean household and the Department had failed to make reasonable efforts to reunite her with her children. While it is clear from the record that Doe and her husband consistently maintained a relationship with their children throughout the

history of the case by taking full advantage of their visitation rights, the evidence indicates Doe was aware of what she needed to do in order to permanently reunite with her children, and she simply failed to do it. With regard to the condition of her home, the evidence shows the Department provided Doe with written notices detailing the specific steps she needed to take in order to make the home suitable for the children. Furthermore, the record shows this is not a case where the parents have occasionally let their home get dirty. Rather, the record indicates that the conditions in Doe's home were persistent and more than merely isolated events. Doe and her family worked with the Department for nearly three and a half years from the time the Department first got involved until the time the Department filed its last petition for termination of parental rights, and throughout this period, Doe still had not remedied the condition of her home. At trial, Doe also argued that on the day the children were removed for the second time, she was in the process of moving into a new apartment that was safe and sanitary for the children. The magistrate court was aware of this fact, but concluded that Doe and her husband had developed a pattern of living in a residence until it became filthy and then moving to a different place. The guardian ad litem also shared this concern and testified that each of the residences Doe lived in had, after a period of time, become unsafe and unsanitary for the children. Ultimately, the magistrate court found that the condition of Doe's home represented her lifestyle and was unlikely to change.

Furthermore, the evidence in the record also indicates that the Department made reasonable efforts to reunite Doe with her two children throughout the entire history of the case, including conducting numerous visits to the household, providing written notices to Doe detailing the steps necessary to make the house suitable for the children, sending a nurse from the health district to Doe's home to evaluate the household and make suggestions, and providing regular access to the children while they were in foster care. Additionally, the Department developed two different case plans in order to assist Doe in reuniting with her children and provided financial assistance to help facilitate Doe's compliance with the case plans. More specifically, the Department paid for Doe to obtain a psychological evaluation, paid for her to attend parenting classes, and paid the security deposit on an apartment, allowing Doe to move into subsidized housing, all of which were efforts by the Department to help Doe comply with the case plan. The magistrate court found that Doe had failed to take advantage of any of the resources or programs made available to her in order to reunite with her children.

Moreover, the magistrate court concluded that terminating parental rights was necessary to provide the children with stability. The court heard testimony from the guardian ad litem, one of the social workers, and the children's great aunt, who was also their prior foster mother, that it was in the best interests of the children to terminate parental rights. The magistrate court also heard testimony that the children were thriving in foster care. Finally, the record indicates that the children were in foster care for approximately three and a half years while Doe was subject to the unfulfilled provisions of the case plans. During this time, the children were placed in several different foster homes and were forced to live in a state of instability. For this reason, the magistrate court concluded it was in the best interests of the children to provide them with permanency.

Doe, on the other hand, does not point this Court to any evidence indicating that the removal of the children is not in their best interests, other than to argue that the children were not actually injured by the condition of the home. Because actual injury is not required to find terminating parental rights is in the best interests of the children, Doe's argument fails. Drawing all reasonable inferences in favor of the magistrate court's judgment, we find substantial, competent evidence in the record to support the magistrate court's conclusion that Doe put her children at risk of harm by continuously subjecting them to unsafe and unsanitary conditions in the home. Therefore, we find there is substantial and competent evidence in the record to support the magistrate's conclusion that it is in the children's best interests to terminate parental rights.

## IV.
### Conclusion

This Court affirms the magistrate court's judgment terminating Doe's parental rights to her two children.

Chief Justice EISMANN, and Justices BURDICK, W. JONES, and HORTON CONCUR.