## IN THE SUPREME COURT OF THE STATE OF IDAHO
### Docket No. 39247

| | |
|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENTAL RIGHTS OF JANE (2011-16) DOE.<br>-------------------------------------------------------<br>IDAHO DEPARTMENT OF HEALTH & WELFARE,<br><br>    Petitioner-Respondent,<br><br>v.<br><br>JANE (2011-16) DOE,<br><br>    Respondent-Appellant.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Boise, January 2012 Term<br><br>2012 Opinion No. 29<br><br>Filed: February 16, 2012<br><br>Stephen W. Kenyon, Clerk |

Appeal from the Magistrate Court of the Fourth Judicial District of the State of Idaho, Ada County. Hon. Cathleen MacGregor-Irby, Magistrate Judge.

The Order of the Magistrate Court terminating parental rights is <u>affirmed</u>. Costs are awarded to respondent.

Alan E. Trimming, Ada County Public Defender, Boise, for appellant.

Hon. Lawrence G. Wasden, Idaho Attorney General, Boise, for respondent.
_____

W. JONES, Justice

### I. NATURE OF THE CASE

Jane Doe appeals the termination of her parental rights with regard to her son, John Doe, contending that the magistrate court failed to properly consider her improved participation in mental health and family counseling services. Because there is substantial and competent evidence to support the magistrate court's Final Judgment that termination of Jane Doe's parental rights was in John Doe's best interests, the magistrate court did not err in terminating her parental rights.

### II. FACTUAL AND PROCEDURAL BACKGROUND

John Doe ("Child") was born on January 28, 2004. Child has two older twin half-brothers ("Twins") and a full-sister. Jane Doe ("Mother") is the biological mother of all of the children. Twins were involved at the beginning of this action, but their child protection cases have since been vacated as they have been placed with their father. Child's sister was previously adopted by her paternal aunt on October 14, 2004. Child's father consented to the termination of his parental rights, contending that adoption is in Child's best interests because of Mother's history of neglect. Thus, this action relates solely to Mother's parental rights with regard to Child.

Throughout the month of January 2010, the Department of Health and Welfare ("the Department") received four referrals ("the January referrals"), involving Mother's neglect. At that time, Child and Twins were residing with Mother pursuant to a custody order. This was the second time Twins were placed in foster care due to Mother's neglect.[1] The January referrals involved excessive absences and tardiness from school, Mother's refusal to engage in Individualized Education Program meetings, disenrollment of the children from school, lack of supervision, and health and safety dangers in the home.

In response to the January referrals, the Department's risk assessor, Dawn Doepke ("Doepke"), made a formal visit with Mother and her children in order to assess the severity of Mother's neglect. As a result of the visit, Doepke offered Mother a referral service with Family Connections, a parenting education program. Mother reacted by becoming very angry and yelling at Doepke. Doepke stated that Mother's volatility was a cause for concern throughout this action. She described Mother's anger as quick to escalate, like "turning on and off a light switch." On numerous occasions, Mother would storm out of Department home visits and end telephone conversations with Department social workers by hanging-up in anger.

On January 29, 2010, the Department filed its Motion for an Order to Remove the Children, contending that Child and Twins were "neglected as they [were] without proper parental care and control, or subsistence, education, medical or other care and control necessary for their well-being because of the conduct or omission of their parents . . . ." The Department asserted that despite its efforts to provide parenting and mental health counseling and financial

---

[1] From October 3, 2005 to July 7, 2006, Twins were placed in foster care, primarily due to Mother providing a hazardous home environment.

support, it received twenty referrals,[2] beginning in 2000, regarding "concerns of [physical and educational] neglect, lack of supervision, hazardous home environment, and physical abuse."

On February 4, 2010, the magistrate court issued its Order to Remove the Children, holding that the children "should be removed from their present conditions and surroundings because continuation in such condition[s] or surroundings would be contrary to the welfare [and best interests of the children]." Thereafter, the children were placed in foster care, and Child's guardian ad litem ("the GAL") was appointed. Mother was assigned a case worker, Francine Frank ("Frank"), to establish a Case Plan, provide Mother with referral services, and to assess any further risks.

When Child was placed in foster care, he had significant dental needs. He also had unaddressed issues with his vision and asthma. Child was provided with mental health counseling as well.

The Department then filed its Report of Investigation ("ROI") on February 16, 2010. The ROI recommended that the Department retain custody of Child until Mother met the following conditions:

> A. [Mother] will participate in a psychological evaluation and a risk to child assessment approved by the Department social worker and follow any and all recommendations.

> B. [Mother] will participate in a protective parenting program approved [by] the Department social worker, that addresses child development, children with behaviors, and demonstrate skills learned during visitations.

> C. [Mother] will obtain and maintain a stable, safe and healthy home environment for herself and her children. [Mother] will keep the home free of any health and safety hazards.

Thereafter, Mother's Case Plan was filed on March 5, 2010 and modified on March 23, 2010. It provided several areas of concern that Mother was required to satisfy before she could re-establish custody of her children. Specifically, the Case Plan required Mother to provide a home for her children free from health and safety hazards. Mother was to seek Department approval for overnight visits involving third parties. She was also to maintain steady employment or secure other suitable income to meet her children's needs. Furthermore, Mother was to keep her children enrolled in school, attend parenting education classes, and participate in

---

[2] In addition to the January 2010 referrals, the Department previously received sixteen referrals with regard to Mother, involving issues of physical neglect, educational neglect, medical neglect, physical abuse, lack of supervision, hazardous home environment, and exposure to domestic violence.

her children's education planning and mental health treatment.  Finally, the Case Plan states that Mother was to participate in a psychological evaluation and follow through with all recommendations as to medication management and long-term treatment.

On March 2, 2010 and March 15, 2010, Mother participated in psychological evaluations with a Department approved psychological evaluator ("the Evaluator").  The Evaluator found that Mother met the criteria for Major Depressive Disorder and Generalized Anxiety Disorder. He noted that Mother was extremely defensive and evidenced social and behavioral immaturity as well as depression, anxiety, and a general inability to properly express anger.  He further considered Mother's history of childhood physical and sexual abuse and her inability to recognize and appropriately respond to unhealthy relationships with men.[3]

The Evaluator recommended that Mother "receive psychiatric medication services and attend counseling to address her depression, anxiety, social isolation, tendency to make impulsive decisions, [and] childhood trauma . . . ."  He further recommended that Mother receive extensive parenting education and training to help her learn to maintain a stable and clean household appropriate for her children.  In order for Mother to effectively parent Child, the Evaluator stated that she needed to follow all of these recommendations.

Thereafter, the Department provided Mother with referrals for mental health counseling services, family homemaking services, and medication management services.  In subsequent mental health counseling sessions, it was determined that Mother must commit to three years of counseling and medication management treatment in order to adequately address her anger, depression, isolation, and anxiety.  This estimate was dependent on Mother's consistency in attending her mental health, medication management, and parenting counseling sessions.

Even though Mother's Case Plan required strict commitment to her medication management and mental health counseling sessions, Mother, from the onset, missed most of her counseling sessions and often refused to take her psychiatric medications, due to her disdain for such drugs.  Mother has changed her mental health counseling service provider three times, which has significantly impeded her progress.  As a result, she had not progressed beyond the beginning stages of her mental health treatment.

---

[3] In particular, the Evaluator pointed out that Mother reports no concerns about her live-in boyfriend's incarceration for attempting to manufacture methamphetamine.

During this time, Mother also experienced great difficulty in maintaining sufficient income and housing to provide for her own needs, much less the needs of the children, even though she was provided with extensive reunification services by the Department. Specifically, since her children were placed in foster care, Mother moved to three apartments due to her inability to pay rent, has generally been unable to pay her utilities, held three jobs for short periods of time, was unemployed for significant periods of time, and was unable to buy her children clothing. Furthermore, Mother owes four thousand seven hundred dollars in child support to the Department. At this time, due to her low or non-existent income, Mother has only made two payments totaling one hundred seventy one dollars. Mother's monthly child support obligation with regard to Child is one hundred sixty dollars a month.

The magistrate court held a six month review hearing ("review hearing) on August 11, 2010. At the review hearing, the magistrate court considered a Progress Report, which was prepared by Frank. The Progress Report noted several issues regarding Mother's inability to properly manage her mental health symptoms and to follow through with the Case Plan, but ultimately it recognized that Mother made enough progress in attending her counseling sessions in the month prior to the six month review hearing to warrant extending visitation with regard to Child.

On August 16, 2010, the magistrate court filed its Review Hearing Order, incorporating the Department's recommendations. Thereafter, the magistrate court issued its Order for Conditional Extended Visitation and Order for Extended Visitation on February 1, 2011 and March 9, 2011, respectively, permitting extended visitation until May 18, 2011, so long as Mother obtained adequate childcare and followed the Department's safety plan, which was intended to prevent inappropriate sexual touching between Child and Twins, which occurred in the past.[4]

On February 4, 2011, Child was sent home with Mother on the extended home visit. Due to numerous concerns that led the Department to conclude that adoption was in Child's best interests, the extended home visit was terminated on March 18, 2011. In particular, the

---

[4] The safety plan provided that Child was not to sleep in the same room as Twins, Child was not to play in the same room with Twins when the door was closed, Child and Twins were not to use the bathroom at the same time, Mother was to install a door alarm, and Mother was to put a baby monitor in the boys' sleeping areas.

Department noted that Mother was not complying with the safety plan;[5] Mother's house was unsanitary and smelled of cigarette smoke, which presented significant health concerns for Child due to his asthma; Mother was uncooperative with the Department; Mother stopped attending all of her counseling sessions; Child attended only one mental health counseling session and no-showed or cancelled three sessions; Mother threatened to abscond with Child; Mother's behavior was volatile; and Mother lost her job. Furthermore, throughout the extended home visit, Mother was driving on a suspended license.

As a result of Mother's neglect, Child regressed physically, academically, and socially. He evidenced behavior problems that he had prior to being placed in foster care, including persistent sleeping problems and bedwetting. Child's first grade teacher reported that during the extended home visit, he was "like a different child." He displayed a lot of negative attention seeking behavior. He also was "off task . . . , emotionally fragile, cried easily, was less self-confident, had a negative attitude, put objects in his mouth, had difficulty focusing and completing tasks, and was having . . . problems with peers." Child's physical health suffered, during the extended home visit, as well, in that he was gaining weight, was tired all the time, and would come to school smelling like cigarette smoke, even though he suffers from serious allergies and asthma.

After the extended home visit was terminated, Child's mental and physical health improved. He no longer had sleeping problems and his bedwetting subsided. He also no longer relies on his inhaler because of Mother's smoking. Furthermore, Child's teacher and GAL recognized Child's social, physical, and academic improvements.

On May 26, 2011, the magistrate court issued its Order Approving Termination and Adoption as the Permanent Plan, noting that Mother's efforts to comply with her Case Plan have been inconsistent. Thereafter, the Department filed its Petition for Termination of Parent-Child Relationship, contending that termination would be in Child's best interests because of Mother's history of neglect and general inability to discharge her parental responsibilities pursuant to I. C. § 16-2005(1)(b) and (d). The magistrate court filed its Memorandum Decision on September 21, 2011, vesting legal custody of Child with the Department. Thereafter, the magistrate court

---

[5] Frank, upon making an unannounced visit, learned that Mother was not following the safety plan as Child and Twins were sleeping in one bedroom, no alarm was installed, and no baby monitor was purchased. In response to Frank's inquiries as to why the safety plan was not being followed, Mother became very emotional and started yelling.

entered Final Judgment on September 21, 2011, terminating Mother's parental rights with regard to Child. Mother timely filed her Notice of Appeal on October 05, 2011.

### III. ISSUES ON APPEAL

1.  Whether Mother waived the issues of whether termination of her parental rights was proper according to I.C. § 16-2005(1)(b) and (d)?

2.  Whether the magistrate court erred in terminating Mother's parental rights under the best interests of the child standard?

### IV. STANDARD OF REVIEW

The standard of review applicable in parental rights termination cases was set forth in *Idaho Dept. of Health & Welfare v. Doe*:

> Grounds for termination of parental rights must be shown by clear and convincing evidence because each parent has a fundamental liberty interest in maintaining a relationship with his or her child. Clear and convincing evidence is generally understood to be evidence indicating that the thing to be proved is highly probable or reasonably certain. On appeal, this Court will not disturb the magistrate court's decision to terminate parental rights if there is substantial, competent evidence in the record to support the decision. Substantial, competent evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. This Court is required to conduct an independent review of the magistrate court record, but must draw all reasonable inferences in favor of the magistrate court's judgment because the magistrate court has the opportunity to observe witnesses' demeanor, to assess their credibility, to detect prejudice or motive[,] and to judge the character of the parties.

150 Idaho 36, 41, 244 P.3d 180, 185 (2010) (quotations and citations omitted).

### V. ANALYSIS

**A.  Mother Waived the Issues of Whether Termination of Her Parental Rights Was Proper According to I.C. § 16-2005(1)(b) and (d)**

The magistrate court terminated Mother's parental rights because it determined that Mother neglected Child pursuant to I.C. § 16-2005(1)(b) and was unable to discharge her parental responsibilities pursuant to I.C. § 16-2005(1)(d). Furthermore, the magistrate court determined that termination of parental rights is in the best interests of Child. In her opening brief, Mother does not contest that substantial and competent evidence exists to support the district court's holding that Mother neglected Child and was unable to discharge her parental responsibilities. The failure to support an alleged error with argument and authority is deemed a waiver of the issue. *Bach v. Bagley*, 148 Idaho 784, 790–91, 229 P.3d 1146, 1152–53 (2010). This Court "will not consider assignments of error not supported by argument and

7

authority in the opening brief." *See Jorgensen v. Coppedge*, 145 Idaho 524, 528, 181 P.3d 450, 454 (2008) (quoting *Hogg v. Wolske*, 142 Idaho 549, 559, 130 P.3d 1087, 1097 (2006).

Mother merely contends that the magistrate court erred in determining that termination of her parental rights was in the best interests of Child. Accordingly, the only issue to address is whether termination is in Child's best interests.

**B.** **The Magistrate Did Not Err in Determining that Termination of Her Parental Rights Was in the Best Interests of Child**

Mother contends that the magistrate court erred in determining that termination of her parental rights was in the best interests of Child because there is no substantial and competent evidence supporting the magistrate court's finding that she smoked in her home during the extended home visit. As support for her proposition, she points out that her case worker did not actually witness her smoking cigarettes in the apartment and that there were no referrals made to the Department regarding her smoking. Mother further asserts that the magistrate court erred by not properly considering her progress with regard to her mental health, medication management, and parenting counseling. Finally, Mother asserts that because she was once successful in completing her Case Plan with regard to Twins' first placement in foster care, she should be given another opportunity to complete her Case Plan with regard to Child.

*1. The Fact that Mother May Have Smoked During the Extended Home Visit Is Only One Factor to Consider*

There is substantial and competent evidence establishing Mother knew that Child is asthmatic and smoked regardless of his health concerns. Doepke, Mother's case worker, stated that Mother's home often smelled of cigarette smoke. Furthermore, Child's teacher stated that Child generally came to school smelling of cigarette smoke. When Child was in foster care, he rarely used an inhaler as opposed to when he was on the extended home visit. Even if Mother smoked outside during the extended home visit, the fact remains that Child's health suffered.

Regardless, Mother's smoking was one of many factors that the magistrate court considered in rendering its Final Judgment. Thus, even if Mother did not smoke in her home during the extended home visit, this is insufficient to reverse the magistrate court's decision.

*2. The Magistrate Court Did Not Minimize Mother's Progress with Regard to Her Mental Health, Medication Management, and Parenting Services*

Mother's non-attendance prior to the termination of the extended home visit with regard to her mental health, medication management, and parenting counseling sessions greatly

impeded her progress to the point where she is only at the beginning stage of her treatment. Her delayed progress is especially of concern because her mental health counselor stated that her consistency in attending her sessions was essential to her treatment. It wasn't until the Department sought to terminate her parental rights that she started to regularly attend sessions. Given her history of neglect, it is unlikely that her efforts will last.

Even though Mother contends that she is ready to make the changes necessary to parent Child, her efforts come too late. Given Mother's extensive history of referrals and the fact that her progress in mental health and family counseling surfaced in the last few months before her termination trial, Mother's efforts seem token at best. Her inconsistency in treating her depression, anxiety, and anger as well as her poor attendance with regard to her parenting and medication management sessions suggests that she has not even attempted to establish a proper foundation for child rearing until threatened with termination. Mother's lack of progress was most apparent during the extended home visit where her neglect and volatility resurfaced. During that time, Mother did not even follow a simple safety plan intended to protect Child from sexual abuse. The fact that she finished the Case Plan involving Twins, after they were placed in foster care for the first time, is irrelevant because they have since been placed with their father. Instead, this shows that she has not learned from her mistakes. As the record establishes, Mother needs three years to address her mental health issues. With her history of sporadic use of mental health counseling services, she will not likely meet this timeline.

Although Mother's arguments would have been more appropriately directed at refuting neglect, the record establishes that termination of her parental rights is in the best interests of Child. Mother's extensive child protection history establishes that she lacks an adequate foundation for raising children. Mother's problems with housing and income suggest that Mother can barely provide for her own basic needs much less the needs of Child.

Child needs permanency. Except for the six week extended home visit, he has been in foster care continuously for two years. As a result, Child has spent a quarter of his life in foster care. Although Mother contends that she is attempting to change, Child cannot be expected to wait. He is a young, academically bright child. He seems to thrive emotionally, academically, and physically when he is in foster care, away from Mother's emotional volatility and unhealthy lifestyle. This was most apparent during the extended home visit where Child evidenced behavior problems, including persistent sleeping problems, negative attention seeking behavior,

9

loss of self-confidence, difficulty focusing on tasks, problems with peers, and bedwetting. Child also gained weight, was tired all the time, and had to use his inhaler because of Mother's smoking. After the extended home visit, Child's mental and physical symptoms subsided. Thus, there is substantial and competent evidence establishing that termination of Mother's parental rights is in Child's best interests.

## VI. CONCLUSION

This Court affirms the magistrate court's Final Order terminating Mother's parental rights because Mother has waived the issues of neglect and her inability to discharge her parental responsibilities. Furthermore, this Court holds that termination of Mother's parental rights is in the best interests of Child. Costs are awarded to the Department.

Chief Justice BURDICK, Justices EISMANN, J. JONES and HORTON CONCUR.