**IN THE SUPREME COURT OF THE STATE OF IDAHO**

**Docket No. 39392**

| | | |
|---|---|---|
| IN THE MATTER OF THE PARENTAL TERMINATION OF JOHN (2011-18) DOE. | ) ) ) | |
| -------------------------------------------------------- | ) | |
| IDAHO DEPARTMENT OF HEALTH & WELFARE, | ) ) ) | Boise, March 2012 Term |
| | ) | 2012 Opinion No. 53 |
| Petitioner-Respondent, | ) ) | |
| v. | ) ) | Filed: March 22, 2012 |
| | ) | Stephen Kenyon, Clerk |
| JOHN (2011-18) DOE, | ) ) | |
| Respondent-Appellant. | ) | |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County.  Hon. Cathleen MacGregor-Irby, Magistrate Judge.

The magistrate court's order terminating parental rights of the father is affirmed.

Law Office of Theresa A. Martin, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General, Boise, for respondent.

---

**ON THE BRIEFS**

HORTON, Justice.

Child was declared in imminent danger and taken into the custody of the Department of Health and Welfare (the Department). The Department petitioned for termination of John Doe's (Father) parent-child relationship on the grounds of neglect. The matter proceeded to trial, after which the trial court granted the Department's petition. We affirm the trial court's order terminating Father's parental relationship with Child.

## I. FACTUAL AND PROCEDURAL BACKGROUND

When Child was three years and seven months old, his Mother was arrested while Child was in her care. Since Father was already incarcerated, the state declared Child to be in imminent danger. Child was placed in the Department's custody, and a child protection case was initiated.

1

Father was released from custody approximately three months later. The Department petitioned for termination of Mother's and Father's parental rights, alleging that they had neglected Child. Mother did not answer or otherwise appear, and the trial court entered default and terminated her parental relationship with Child.

Father's case went to trial, during which there was testimony that prior to and during Child's early childhood, Father was frequently convicted of crimes involving alcohol and substance abuse, which resulted in his incarceration. A family friend and neighbor testified that she had raised Child in her home during the better part of his first three and a half years, during which Father occasionally visited. When Child was three years and five months old, he returned to his parents' primary care. Approximately three months later, he was declared to be in imminent danger.

Mother's and Father's parental rights as to Child's five older siblings previously had been terminated. The parents consented to termination of their parental rights as to the first four children after the children were found in a hazardous home environment. The parents' relationships with the fifth child were involuntarily terminated based upon findings of neglect and abandonment.[1] Based on the second action, the trial court in the present case found that aggravated circumstances existed such that the Department was not required to make reasonable efforts to prevent Child's placement into foster care. *See* I.C. § 16-1619(6)(d). After Child was removed from the custody of his parents, the Department placed him in the care of the foster mother to his five older siblings. Child was soon diagnosed with, and began extensive treatment for, autism and developmental delays. Before the trial court released the Department from the obligation to make reasonable efforts at reunification, a Department social worker communicated with Father about the extent of Child's special needs and provided Father with the contact information for Child's several healthcare providers, in order that Father could learn how to meet Child's needs. Child's development has improved under the foster mother's care.

At the termination trial, Father testified that he successfully completed his child protection case plan and that he visits Child every week for one hour. One social worker testified that Father's conduct during his weekly interaction with Child was appropriate. Father also testified that he has lived, and worked part time, with a friend for the preceding four months, and

---

[1] In that instance, Mother and Father appealed the trial court's decision. This Court affirmed the findings of abandonment as supported by substantial, competent evidence. *In re Doe*, 146 Idaho 759, 203 P.3d 689 (2009).

that the friend had granted permission for Child to live in the home. Father testified that his efforts to contact Child's healthcare providers had been met with limited success.

The trial court found that although Father had completed the case plan, he had failed to demonstrate that he could meet Child's special needs. The court found by clear and convincing evidence that Father's conduct and omissions met the definition of neglect found in I.C. §§ 16-1602(25)(a) and (b) and that termination of Father's parental rights was in Child's best interests. On November 11, 2011, the trial court entered a final judgment terminating Father's parental relationship with Child. Father appealed.

## II. STANDARD OF REVIEW

"Grounds for termination of parental rights must be shown by clear and convincing evidence because each parent has a fundamental liberty interest in maintaining a relationship with his or her child." *Idaho Dep't of Health & Welfare v. Doe II*, 150 Idaho 36, 41, 244 P.3d 180, 185 (2010). "[W]here a trial court has noted explicitly and applied a clear and convincing standard, an appellate court will not disturb the trial court's findings unless they are not supported by substantial and competent evidence." *State v. Doe*, 144 Idaho 534, 535, 164 P.3d 814, 815 (2007). "Substantial, competent evidence is 'such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *In re Doe*, 143 Idaho 343, 345-46, 144 P.3d 597, 599-600 (2006) (quoting *Folks v. Moscow School Dist. No. 281*, 129 Idaho 833, 836, 933 P.2d 642, 645 (1997)). Since "the magistrate court has the opportunity to observe witnesses' demeanor, to assess their credibility, to detect prejudice or motive and to judge the character of the parties," this Court will draw all reasonable inferences in favor of that court's judgment. *Doe II*, 150 Idaho at 41, 244 P.3d at 185 (internal quotation and citation omitted).

## III. ANALYSIS

This Court recognizes the significance of the parent-child relationship. As we stated in *In re Doe*, 146 Idaho 759, 203 P.3d 689 (2009):

> A parent has a fundamental liberty interest in maintaining a relationship with his or her child. This interest is protected by the Fourteenth Amendment of the U.S. Constitution. Our legislature also recognizes the importance of maintaining the parent-child relationship: "Implicit in [the Termination of Parent and Child Relationship] act is the philosophy that wherever possible family life should be strengthened and preserved . . . ." I.C. § 16-2001. Therefore, the requisites of due process must be met when the Department intervenes to terminate the parent-child relationship. Due process requires that the Department

3

prove grounds for terminating a parent-child relationship by clear and convincing evidence.

*Id.* at 761-62, 203 P.3d at 691-92 (citations omitted). Idaho Code § 16-2005 enumerates several grounds for termination of the parent-child relationship. Under that section, termination is only appropriate if an enumerated ground for termination exists and termination is in the child's best interests. I.C. § 16-2005(1).

**A. Substantial, competent evidence supports the magistrate court's finding that Father neglected Child.**

Neglect of a child is one statutory ground upon which a court may order termination of the parent-child relationship. I.C. § 16-2005(1)(b). Neglect may take several forms, including conduct or omission by a parent which causes a child to be "without proper parental care and control, or subsistence, medical or other care or control necessary for his well-being." I.C. § 16-1602(25)(a); *see also* I.C. § 16-2002(3). Neglect may also exist where a child "lacks the parental care necessary for his health, safety or well-being" due to the parent's inability "to discharge their responsibilities to and for the child . . . ." I.C. § 16-1602(25)(b). In the present case, the Department alleged that Father neglected Child because (1) Father's ongoing criminality and substance abuse issues impaired his ability to provide Child with either a stable home environment or the proper parental care and control necessary for Child's well-being; and (2) Father failed to demonstrate an ability to provide for Child's needs.

The trial court extensively reviewed the testimony of each trial witness with regard to whether Child was neglected, and ultimately found by clear and convincing evidence that Father committed each of these two forms of neglect. The court summarized its findings as follows:

> When the court considers [Father's] parenting history along with his significant substance abuse issues and long periods of incarcerations, and then factors in [Child's] special needs, it is clear that [Father] has not been, and cannot be in the future, the parent that [Child] needs. The evidence before this court is that [Father] is still getting on his feet, trying to find a job, provide for himself and maintain sobriety.
>
> What [Father] seems to suggest is that even though he has never been the primary caregiver to [Child], that because he is out of custody and has gone through a substance abuse program, his situation now is sufficiently better to warrant a delay in termination of his parental rights and determining what is in the best interest of his child.
>
> What [Father] fails to appreciate is that his conduct and omissions during the period prior to the child protection case show a complete disregard for his child. He was absent as a caretaker and was completely unwilling to assume any

4

parental responsibility for his child. Then, when [Child] was declared in imminent danger, [Father] was incarcerated. The court recognizes that [Father] is currently maintaining sobriety, has completed a treatment program and is compliant with probation. He apparently has housing and part time employment. But quite frankly it is too little, too late. This child has significant special needs that [Father] cannot even fully grasp or appreciate. Neither before or after the child protection case began did [Father] ever try in any meaningful way to find out about [Child's] conditions or be included in his therapies.

Therefore, based on the foregoing there is clear and convincing evidence that [Father] neglected his child.

As we explain hereafter, substantial and competent evidence supports these findings.

We have recognized that "specific evidence from another CPA proceeding concerning [a parent's] ability at present to provide parental care and control may be probative of neglect as defined in I.C. § 16–1602(25)(a) or (b) . . . ." *Idaho Dep't of Health & Welfare v. Doe (2011-03)*, ___ Idaho ___, ___, 260 P.3d 1169, 1178-79 (2011). As the trial court found, Father has established a pattern of failed parenting. Before the present case was initiated, Father's parental rights to five children were terminated in two separate child protection actions.[2] The Department case manager who handled the previous cases testified that Father's rights were voluntarily terminated as to four of the children after they were declared in imminent danger due to unsanitary home conditions. Later, Father's rights were involuntarily terminated as to the fifth child after no parent or guardian was available to authorize treatment when the child required emergency medical care. With regard to each of these five children, there were concerns about Father's frequent incarceration, drug abuse, and inability to maintain safe and appropriate housing. Each of the children for whom Father's parental rights were terminated had special needs that Father never attempted to address.

The evidence produced at trial also supports the trial court's finding that Father has failed to provide parental care or control for most of Child's life. Child was born in March 2007. Father was incarcerated in April through May of 2007. In August 2007, he was sent to prison and was paroled in early 2009. He returned to prison in October 2010 and was paroled in February 2011. These repeated stints behind bars have prevented Father from providing care and support for Child.

---

[2] The trial court also noted that Father "has a total of nine children whom he has never been a full time parent to or care giver for."

A neighbor and family friend testified that, during Child's first three and a half years, she provided for Child's basic needs by allowing Child to live in her home. During the time that Father was not in custody, Father's contact with Child was limited to occasional visits and overnight stays. Father did provide diapers for Child when so requested by the caregiver. When Child was almost a year old, the caregiver noticed and sought assistance in addressing some aspects of his delayed development. As the trial court found, there is no indication that Father attempted to involve himself in Child's treatment at that time. In August of 2010, Father and Child's mother resumed Child's primary care. Less than three months later, Father returned to prison. The record thus demonstrates that, unlike Father, a non-family member cared and provided for Child for the vast majority of Child's life before he came into the Department's custody.

The trial court's finding that Child has significant special needs is likewise supported by the record. Child was taken into the custody of the Department on November 10, 2010. The social worker who handled his case testified that although Child was then three years and eight months old, he was not toilet trained, could neither clothe himself nor brush his own teeth, and only communicated by grunting or crying. The Department placed Child with the foster mother to his five siblings, who testified that when Child entered her care, he had a number of unusual behaviors and his teeth suffered from visible decay. Child responded to most sounds by covering his ears, threw temper tantrums when one attempted to remove his shoes and refused to remove them himself, and had difficulty sleeping.

Child was soon diagnosed with mild to moderate autism and developmental delays that require extensive and ongoing treatment and interventions. These include occupational therapy, speech therapy, developmental therapy, developmental preschool, medical visits, and regular administration of medication. These various treatments and therapies require that Child be transported to sessions at least four days every week.

The record also supports the trial court's finding that Father has not adequately acquainted himself with the extent of Child's special needs or with the means by which to address those needs. According to the social worker assigned to Child's case, Father's interactions with Child during his weekly hour-long visits are "appropriate," as well as "loving and tender." There is evidence that Father and Child are bonded to one another. However, the

6

evidence also demonstrates Father's lack of understanding of Child's special needs. Father simply testified that he was aware that Child "needs to catch up on some of his developments."

In late February 2011, a social worker encouraged Father to contact Child's several healthcare and therapeutic providers to learn both about Child's special needs and about how to provide for those needs. The social worker provided Father with each provider's contact information. Father testified that he attempted to contact several of the providers, but had little success. When he did make contact with Child's occupational therapist, he inquired whether there were certain toys or tools that he could bring to their hour-long visits to help with Child's development. There is no evidence that Father inquired about the nature of Child's needs or how to address those needs.

As of August 23, 2011 (the first day of trial), Father had never attended any of Child's therapeutic or medical appointments. When asked whether he was familiar with Child's treatment, Father testified:

> I'm not too familiar with it because, like I said, I only made a few phone calls, and I have had difficulty in one or two of them. But, you know, if I were to be given the chance to, you know, catch up on more of this, I would make a thing to get more information on what I need to know what needs to be done with him.

When the termination trial resumed on October 7, 2011, Father had not made any further attempt to contact Child's providers, despite having been reminded repeatedly of Child's special needs. The record clearly supports the trial court's finding that Father did not take the steps necessary to develop a thorough understanding of Child's needs or to appreciate what would be required of him if he were to become Child's primary caregiver.

Father contends that the trial court ignored lifestyle improvements he has made since his most recent release from incarceration. It is true that "[a] trial court may not ignore relevant and admissible evidence the legislature has deemed relevant." *State, Dep't of Health & Welfare v. Doe III*, 149 Idaho 409, 414, 234 P.3d 733, 738 (2010) (citing *In re Adoption of Doe*, 143 Idaho 188, 192, 141 P.3d 1057, 1061 (2006)). Indeed, Father has successfully completed his case plan, including a number of treatment programs. These include random drug testing, a substance abuse evaluation, drug and alcohol treatment, and a parenting class. Father's uncontradicted testimony was that he has been sober since October 2010, when he most recently entered prison. He explained that his most recent substance abuse treatment has taught him to think before he acts and avoid situations that enable bad behavior. Father attributes his recent success to his desire to

7

maintain his parental relationship with Child. Father's cousin confirmed Father's testimony. She has noticed a substantial change in Father since he underwent treatment and she expressed no concern about his ability to parent Child.

Contrary to Father's assertion on appeal, however, the trial court did not ignore this evidence. Rather, the court expressly acknowledged that "[Father] is currently maintaining sobriety, has completed a treatment program and is compliant with probation. He apparently has housing and part time employment."[3]

Nonetheless, the court weighed the totality of the evidence and concluded that "quite frankly it is too little, too late." The trial court found that there was no evidence that Father has ever maintained a consistent pattern of employment or housing. We have previously regarded such failures as grounds to affirm findings of neglect. *Doe (2011-03)*, ___ Idaho at ___, 260 P.3d at 1172-73. Indeed, Father points to nothing in the record as to his past employment or housing.

The trial court noted that Father has lived in shelters, a sober living environment, and with friends and family, accurately characterizing this as "a history of unstable housing." The court further noted that, at the time of trial, Father lived with a roommate, without a lease, and that Father was purportedly employed by the roommate, with rent being withheld from his wages. The court emphasized that Father's ability to continue to reside at that location was contingent upon his ability to maintain his sobriety. Based on Father's history of recurrent substance abuse, the court also expressed concern for the prospect that Father would relapse and lose his housing. In light of this evidence, and recognizing the uncontroverted evidence that Child had spent very little time living with Father, we find that substantial, competent evidence supports the trial court's finding that Father lacked the ability to provide housing for Child.

This Court has also affirmed findings of neglect where a parent has failed to demonstrate an ability to obtain consistent employment and a stable income. *E.g.*, *Doe (2011-03)*, ___ Idaho at ___, 260 P.3d at 1175; *In re Doe (2011-02)*, 151 Idaho 356, ___, 256 P.3d 764, 774 (2011). Father and his roommate testified that the roommate occasionally employed Father on a part-time basis in 2011. However, the trial court expressed doubt as to their credibility on this subject, noting that neither Father nor the roommate were able to give a clear description of the manner in which Father was employed. As to future employment, Father's testimony was inconsistent.

---

[3] We observe that there is an inconsistency between this statement regarding part-time employment and more detailed observations by the trial court regarding the credibility of the evidence of Father's employment.

He testified that when he completes his rehabilitative programs, he intends to seek full time employment. He also testified that he has enrolled or intends to enroll in a two-year program to study auto body repair. But Father also explained that:

> It's not – it's not set in stone. It's not going to happen. I might get a nighttime job. I might get a swing shift job. I never know, but I need a – you know, these are the things I need to figure out, you know. If I need to work days, I will work days, and if I need to work, like, swing shift or graveyard shift, I also need to figure out – all these are the things that I need to take care of for [Child]. Like where am I going to take him, who is going to babysit him, are they going to be able to watch him while I'm gone to work. I need to think of all these things ahead of time as well. I am just giving you, like examples that I might be able to do or what might not work.

Father's testimony demonstrates that he has done little more than consider possibilities of future employment. This Court must honor the trial court's assessment of the lack of credibility of Father's claim of employment by his roommate. We find that substantial and competent evidence supports the trial court's finding that Father lacks, and will continue to lack, the financial ability to support Child.

The trial court found that "[w]hat [Father] fails to appreciate is that his conduct and omissions during the period prior to the child protection case show a complete disregard for his child." The social worker who handled Child's protection case testified that he was concerned that Father "is still dependent on other people to provide for his own basic living situation," is "still struggling to find employment and to financially support" himself, and lacked stable housing sufficient to meet Child's needs. In the social worker's opinion, Father's parenting and criminal history, in combination with the fact that he "is still getting on his feet himself," and did not appear to appreciate the severity of Child's needs, rendered it unlikely that Father would be able to meet Child's extensive needs.

In light of the foregoing, we find that substantial and competent evidence supports the trial court's conclusion that Father neglected Child by conduct or omission which caused Child to be "without proper parental care and control, or subsistence, medical or other care or control necessary for his well-being," I.C. § 16-1602(25)(a), and that Child "lacks the parental care necessary for his health, safety or well-being" due to Father's inability to discharge his responsibilities to and for Child, I.C. § 16-1602(25)(b).

**B. Substantial, competent evidence supports the magistrate court's finding that termination of Father's parent-child relationship is in Child's best interests.**

This Court has previously upheld a finding that termination of parental rights was in the best interests of a child when the child flourished in foster care and the child's continued success depended upon placement in a permanent, stable family environment. *Idaho Dep't of Health & Welfare v. Doe (2011-12)*, 151 Idaho 846, ___, 264 P.3d 953, 957-60 (2011). Here, the social worker testified that when he last met with Father in March 2011, prior to the finding of aggravated circumstances, the interaction led him to believe that Father "struggled to really grasp" the entirety of Child's special needs. The social worker felt that although he intended to convey to Father an understanding of the depth and complexity of Child's needs, Father's focus repeatedly shifted to his own desire to be reunited with his son.

Further, Child's foster mother testified that she has never known Father to attend one of Child's therapy sessions or medical appointments. She stated that she does not believe Father "has any idea of the scope, magnitude, [sic] of the problems that [Child] is encountering with all of his developmental problems." The foster mother is concerned that Child's development will regress if his therapies are disrupted or are not consistently reinforced in the home. The several treatments and therapies necessary to Child's continued development require that he be transported to sessions at least four out of five days each week. The healthcare providers regularly assign his foster mother homework to implement, and teach Child's five siblings to implement, therapeutic techniques and counseling in the home. Over the course of Child's treatment, he has made substantial improvements in occupational therapy and slight improvements in his speech and language abilities. He has developed healthy relationships with his siblings, and several of his behavioral difficulties have lessened or resolved.

The trial court noted that the guardian ad litem testified that termination of Father's parental rights was in Child's best interests. The trial court found that "given [Father's] history of substance abuse, criminal activity and inability to independently maintain[] housing and employment, it is highly probable that he will not be able to provide his child with the stable, safe and consistent home environment that [Child] needs in order to maintain the progress he has made with regard to his special needs. Additionally, over the course of the last year, [Father] has not expressed a genuine interest in learning about [Child's] special needs let alone how to care for [Child's] needs on a daily basis."

The trial court further noted that Father had consistently placed his interests ahead of those of Child and expressed concern that this misplaced set of priorities were reflected at trial,

stating: "[e]ven during the trial, [Father] focused on himself and how termination of his rights impacted him. [Father] focused on how he needed [Child] and not on what [Child] needed, given [Child's] limitations," in that Father's expressions of concern were directed at his wants and needs, rather than Child's needs.

Having carefully considered the evidence presented at trial, we find that the trial court's conclusion that termination of Father's parental rights was in Child's best interests to be supported by substantial, competent evidence.

## IV. CONCLUSION

We affirm the trial court's judgment terminating Father's parent-child relationship with Child. Costs to Respondent.

Chief Justice BURDICK and Justices EISMANN, J. JONES and W. JONES **CONCUR**.