**IN THE COURT OF APPEALS OF THE STATE OF IDAHO**

| | | |
|---|---|---|
| IN THE MATTER OF THE TERMINATION OF THE PARENTAL RIGHTS OF JANE (2011-21) DOE. | ) ) ) | |
| IDAHO DEPARTMENT OF HEALTH & WELFARE, | ) ) | Docket No. 39435 |
| Petitioner-Respondent, | ) ) ) | |
| v. | ) ) | |
| JANE (2011-21) DOE, | ) ) | |
| Respondent-Appellant. | ) ) ) | |
| IN THE MATTER OF THE TERMINATION OF THE PARENTAL RIGHTS OF JOHN (2011-22) DOE. | ) ) ) | |
| IDAHO DEPARTMENT OF HEALTH & WELFARE, | ) ) | Docket No. 39436 |
| Petitioner-Respondent, | ) ) | 2012 Unpublished Opinion No. 475 |
| v. | ) ) | Filed: May 14, 2012 |
| JOHN (2011-22) DOE, | ) ) | Stephen W. Kenyon, Clerk |
| Respondent-Appellant. | ) ) ) ) | THIS IS AN UNPUBLISHED OPINION AND SHALL NOT BE CITED AS AUTHORITY |

Appeal from the Magistrate Division of the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. Carolyn M. Minder, Magistrate.

Judgments terminating parental rights, affirmed.

Theresa A. Martin, Meridian, for appellant Jane Doe.
Alan E. Trimming, Ada County Public Defender; Adam C. Kimball, Deputy Public Defender, Boise, for appellant John Doe.

Hon. Lawrence G. Wasden, Attorney General; Mary Jo Beig, Deputy Attorney General, Boise, for respondent.

_____

1

LANSING, Judge

Jane Doe (Mother) and John Doe (Father) appeal from the magistrate's order terminating their parent-child relationships with their four children on grounds of neglect. We affirm.

## I.

## BACKGROUND

On July 29, 2010, police responded to Mother's house after receiving reports that her children were not being properly supervised. Mother left the home the day before but had not returned. She left her and Father's four children, then ages nine, five, four, and three months, in the care of two homeless people that Mother allowed to stay in the home. The two did not know how to provide for the children and wanted to leave the residence, but could not because they had no way to contact Mother. Father was not residing in the home because he was incarcerated on a charge of delivery of methamphetamine. The children were declared in imminent danger and taken into the custody of the Department of Health and Welfare.

A Child Protective Act (CPA) case was initiated and the children were placed in foster care. In September 2010, separate case plans for Mother and Father were developed and adopted by the magistrate. Because Father had pleaded guilty and had just been sentenced to a unified term of incarceration of twenty years, with ten years fixed, with the court retaining jurisdiction, his assigned tasks were accordingly limited. He was to maintain regular contact with the Department and the children by telephone or mail and enroll in education and drug recovery classes while incarcerated. Mother's case plan required her to submit to periodic drug testing, complete substance abuse treatment, maintain income and housing sufficient for the needs of the children, participate in parenting education, and demonstrate her ability to appropriately parent during visits with the children.

Mother was on felony probation for possession of methamphetamine at the time her children were taken from her custody. She told a Department worker at the time her children were taken that she had been "clean" for five years. However, twelve days after her children were taken she tested positive for methamphetamine, amphetamine, and marijuana. Thereafter, Mother refused to produce samples for a number of drug tests requested by the Department. Mother was arrested on a half-dozen occasions during the first six months of her case plan for probation violations and frequent instances of driving without privileges. In February 2011, she was again arrested and charged with possession of a controlled substance. During this time

2

Mother was admitted into drug court but failed to complete the program. Mother admitted using methamphetamine on three occasions in March and April 2011, and twice tested positive for methamphetamine during this time. Her felony probation was revoked in April 2011, and she was sentenced to a six-month period of retained jurisdiction. While incarcerated on her rider, Mother completed substance abuse assessments and completed several programs including relapse prevention.

On August 5, 2011, the Department filed a petition to terminate Father's and Mother's parental rights as to all four children on grounds of neglect and inability to discharge parental responsibilities. Count I of the petition for termination alleged that:

> The children are neglected as they are without proper parental care and control necessary for their well-being because of the conduct or omission of their parents, to wit: the mother and the father's historic and on-going involvement with the criminal justice system and the resulting periods of incarceration impair their ability to provide stable, consistent parental care for the children.

Count II of the petition for termination alleged that:

> The children are neglected as they are without proper parental care and control necessary for their well-being because of the conduct or omission of their parents, to wit: the mother and the father's historic and on-going use and abuse of controlled substances and/or lack of consistent participation in drug treatment, impair their ability to provide stable, consistent parental care for the children.[1]

Trial was held on September 13-14 and October 27, 2011. At the time of trial, Mother remained incarcerated but Father had recently been released on probation following his period of retained jurisdiction. The magistrate found that, although Mother had made progress toward her case plan tasks while incarcerated and Father had completed his case plan tasks while incarcerated, there was clear and convincing evidence that Mother's and Father's conduct and omissions prior to that time met the definition of neglect found in Idaho Code § 16-1602(25)(a) and that termination of their parental rights was in the children's best interests. On November 23, 2011, the trial court entered final judgments terminating Mother's and Father's parental relationships with the children. Mother and Father appeal.

---

[1] The petition contained additional allegations of neglect and an allegation that the parents were unable to "discharge parental responsibilities and such inability will continue for a prolonged indeterminate period and will be injurious to the health, morals or well-being of the child." *See* I.C. § 16-2005(d). We need not address these additional independent grounds for termination in order to resolve this appeal.

## II.

## STANDARD OF REVIEW

"Grounds for termination of parental rights must be shown by clear and convincing evidence because each parent has a fundamental liberty interest in maintaining a relationship with his or her child." *Idaho Dep't of Health & Welfare v. Doe II*, 150 Idaho 36, 41, 244 P.3d 180, 185 (2010). This interest is protected by the Fourteenth Amendment of the United States Constitution. *In re Doe*, 146 Idaho 759, 761-62, 203 P.3d 689, 691-92 (2009). Our legislature also recognizes the importance of maintaining the parent-child relationship: "Implicit in [the Termination of Parent and Child Relationship] chapter is the philosophy that wherever possible family life should be strengthened and preserved . . . ." I.C. § 16-2001. Therefore, the requisites of due process must be met when the Department intervenes to terminate the parent-child relationship. Due process requires that the Department prove grounds for terminating a parent-child relationship by clear and convincing evidence. *Doe* at 761, 203 P.3d at 691. Where a trial court has expressly identified and applied a clear and convincing standard, an appellate court will not disturb the trial court's findings unless they are not supported by substantial and competent evidence. *State v. Doe*, 144 Idaho 534, 535, 164 P.3d 814, 815 (2007). Substantial, competent evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *In re Doe*, 143 Idaho 343, 345-46, 144 P.3d 597, 599-600 (2006). Since "the magistrate court has the opportunity to observe witnesses' demeanor, to assess their credibility, to detect prejudice or motive and to judge the character of the parties," this Court will draw all reasonable inferences in favor of that court's judgment. *Doe II*, 150 Idaho at 41, 244 P.3d at 185 (internal quotation and citation omitted).

## III.

## ANALYSIS

Idaho Code § 16-2005 enumerates several grounds for termination of the parent-child relationship, including parental neglect of the child. The statute authorizes termination only if an enumerated ground for termination exists and termination is in the child's best interests. I.C. § 16-2005(1). A child may be found to be "neglected" under any of several statutory definitions of neglect. *See* I.C. § 16-2002(3)(a) (incorporating the definitions of the term "neglected" in Idaho Code § 16-1602(25)(a)-(d)). As relevant to the allegations in the present case, a child is "neglected" if the child is "without proper parental care and control, or subsistence, medical or

4

other care or control necessary for his well-being because of the conduct or omission of his parents . . . or their neglect or refusal to provide them." I.C. § 16-1602(25)(a). The statutory grounds for termination under Idaho Code § 16-2005 are independent and if any one or more of the grounds for termination are found, termination may be granted. *In re Aragon*, 120 Idaho 606, 611, 818 P.2d 310, 315 (1991); *Doe v. State*, *Dep't of Health & Welfare*, 123 Idaho 502, 503-04, 849 P.2d 963, 964-65 (Ct. App. 1993).

In the present case, the magistrate found that Mother and Father neglected the children because Mother's and Father's historic and ongoing criminality and use of controlled substances impaired their ability to provide the children with the proper parental care and control necessary for the children's well-being. On appeal, Mother and Father first argue that there was not clear and convincing evidence supporting these findings of neglect. They do not directly challenge the sufficiency of the evidence relied upon by the magistrate, but instead focus on particular evidence which, they argue, weighs against the finding of neglect. In addition, Mother argues that the magistrate erred by ignoring or at least not discussing evidence of her case plan performance while she was incarcerated prior to and during the trial, her current plan to remain sober, and a period from 2004 to 2010 when, she says, she did not commit any new crimes. Similarly, Father argues that the magistrate erred by ignoring or at least not discussing evidence of his case plan compliance while he was incarcerated prior to trial and to his current commitment to remain sober.

## A. Substantial, Competent Evidence Supports the Magistrate's Findings that Mother and Father Neglected the Children

The magistrate found that both Mother and Father were long-term substance abusers addicted to illegal drugs and that over the span of their children's lives, both had been frequently incarcerated for drug and other criminal offenses, all to the harm and detriment of the interests and needs of their children. The evidence supports the magistrate's conclusions.

The history of Mother's and Father's criminality and drug use that was considered by the magistrate began long before the present CPA proceeding began and had resulted in a previous CPA case. This history is probative of neglect and relevant in predicting future behavior. *See Idaho Dep't of Health & Welfare v. Doe*, 151 Idaho 498, 508, 260 P.3d 1169, 1179 (2011) (specific evidence from another Child Protective Act (CPA) proceeding concerning a parent's ability at present to provide parental care and control may be probative of neglect); *In re Doe*, 142 Idaho 594, 597, 130 P.3d 1132, 1135 (2006) (past criminal behavior is relevant in

considering whether to terminate parental rights); *In re Dayley*, 112 Idaho 522, 525-26, 733 P.2d 743, 746-47 (1987) (evidence of past character may be relevant in predicting future behavior). Mother's and Father's first child (Boy I) was born in 2000. Thereafter, Mother and Father had three more children together (Girl, Boy II, and Boy III) even though Mother and Father had an on-again, off-again relationship, Father rarely resided in Mother's home or actively parented his children, and Father did little to support his children financially. Mother did not consistently work and relied mostly on government assistance to provide housing and food for the children. At her birth in November 2004, Girl tested positive for amphetamines, barbiturates, and THC, showing that Mother was using these drugs during gestation. The Department removed Boy I and two-day-old Girl from the home, initiated CPA proceedings and placed the children in foster care. Father was not living with the family at the time. Over the next two years of CPA proceedings, neither Mother nor Father made much progress toward completing their case plans.

In December 2004, Mother tested positive for methamphetamine and was referred for drug treatment but did not complete it. In January 2005, Mother was charged with felony possession of methamphetamine after the drug was found in her home, and in February 2005, she was charged with possession of marijuana and frequenting a place of drug use. She pleaded guilty to the charges in March 2005. In April 2005, Mother also pleaded guilty to three driving without privilege charges and was placed on probation but soon was arrested for a probation violation. In May 2005, Mother tested positive for methamphetamine and was again charged with a probation violation. In June 2005, Mother pleaded guilty to the November 2004 methamphetamine charge. She was admitted to a drug court intensive substance abuse program in lieu of incarceration but was thereafter twice incarcerated for drug court violations including failed urinalysis testing. Mother was charged with additional misdemeanor probation violations in January and February 2006.

Father's criminal history and performance during this time was no better. He had been convicted in 1999 and 2000 in California for two counts of possession of methamphetamine. From 2003 to the end of the first CPA case in October 2006, Father was convicted four times for driving on an invalid license, three times for driving without privileges, five times for violation of court orders, and one time for possession of drug paraphernalia. Father tested positive for methamphetamine at the start of the CPA case in December 2004 and was tasked with completing a drug treatment program. Over the next six months he sporadically attended classes

and did not complete treatment. Father tested positive for methamphetamine a number of additional times during the CPA case and failed to appear for a number of other scheduled tests. He was jailed for contempt of court. Father had little contact with the children during the first CPA case because he could not produce a clean urinalysis test and was otherwise noncompliant with testing requirements. In January 2006, Father admitted that he had been using methamphetamine from the beginning of the first CPA case. He again was directed to complete a drug treatment program, but he participated in treatment for one month and then stopped attending.

During the two-year period of the first CPA case, the longest period Mother lived at a particular residence was four months. Father provided several different addresses, but was not always in communication with the Department about where he was living or who he was living with. Mother was employed at a couple of jobs for short periods of time. Father reported a variety of jobs but did not provide supporting documentation.

Mother's and Father's third child (Boy II) was born in December 2005, while the first CPA case was pending. Mother parented Boy II by herself. The Department did not act to remove the child because Mother was participating in drug court and had not been discharged. The first CPA case ended in October 2006 when a Canyon County judge approved a guardianship of Boy I and Girl with Father's brother and his wife, and the Department acquiesced with that placement. At that time, Mother and Father had made little progress toward completing their case plans.

Thereafter, Mother was in the drug court program until May 2007, but she did not successfully complete it. She was incarcerated in June 2007 and, at that time, sent Boy II to live with Mother's grandparents in California. Mother was released on probation in December 2007, but she did not arrange for Boy II to be returned to her until September 2008. The two-year guardianship for Boy I and Girl was dissolved in December 2008, and the children resumed living with Mother. Father was apparently back living with Mother at that time, at least for a short duration. Mother's and Father's fourth child (Boy III) was born in April 2010.

From the end of the first CPA proceeding in October 2006 until shortly before the initiation of the present CPA case in July 2010, Father was convicted once for possession of methamphetamine, once for resisting and obstructing a police officer, seven times for driving without privileges, three times for violation of a court order, three times for failure to appear,

three times for probation violations, and once for contempt of court. Additionally, in June 2010, Father was arrested for delivery of methamphetamine. He pleaded guilty on July 22. On July 29, 2010, all four children, then ages nine, five, four, and three months, were taken from Mother's home, and the present CPA action was filed. Six weeks later, in September 2010, Father was sentenced to a unified twenty-year term of incarceration with ten years fixed, but the court retained jurisdiction for one year. Father was thus in jail at the time the instant CPA proceedings commenced and was incarcerated until shortly before the termination trial. By the time of trial in this case, Father had been released on probation, and he had completed his case plan tasks that were assigned to him for completion while he was incarcerated. Specifically, he had maintained regular contact with the Department and the children by telephone or mail and completed education and drug recovery classes while incarcerated.

Mother was on felony probation for possession of methamphetamine when the Department removed the children from her custody on July 29, 2010. Prior to that event, the Department had received several reports that the children were left alone unsupervised because Mother was consistently absent. Before her case plan was even formally adopted, Mother tested positive for methamphetamine, amphetamine, and marijuana. Mother's case plan required that she submit to periodic drug testing, complete substance abuse treatment, maintain income and housing sufficient for the needs of the children, participate in parenting education, and demonstrate her ability to appropriately parent during visits with the children. Her performance over the next nine months was poor. According to the testimony of Department workers, Mother failed to complete a number of additional drug tests requested by the Department, attended only three hours of substance abuse treatment classes, did not attend parenting education classes, and did not visit the children at all during August 2010. Although she later participated in some Department-supervised visits with the children, her parenting conduct was often not appropriate. She was erratic and easily frustrated with her children, often resorting to yelling, demeaning comments, criticism, and threats of physical violence as her primary parenting tools. Mother sometimes did not appear for visits, blaming the Department for lack of scheduling clarity. Mother did not obtain employment and had no source of income other than government assistance. While this CPA case was pending, Mother was charged with and convicted for possession of marijuana as well as five separate episodes of driving without privileges. Mother was admitted into drug court but did not complete the program. She admitted using

methamphetamine on three occasions in March and April 2011. Her probation was revoked in April 2011 while the present CPA proceeding was still pending, and she was sentenced to a term of imprisonment, with the court retaining jurisdiction. While in prison, Mother completed a substance abuse treatment program and began other case plan tasks. She remained incarcerated at the time of the trial in this case. Obviously, she was not then earning an income sufficient to support her children nor able to provide suitable housing or parental care for them.

On the evidence of the foregoing facts, the magistrate found that the alleged grounds for termination had been proved by clear and convincing evidence as to both Father and Mother.

On appeal, Father expressly "does not dispute that he has a historical involvement with the criminal justice system or that he has had multiple periods of incarceration." Rather, he contends that this "does not currently impact his ability to provide the children with proper care and control." He bases this assertion on the fact that, while incarcerated for delivery of methamphetamine, he received programming to help him address the criminal thinking that caused his prior frequent incarcerations, and he asserts that he "internalized" the programming. Similarly, Father "does not dispute that he has a history of use and abuse of controlled substances and a history of a lack of consistent participation in drug treatment," but disputes that his use and abuse of controlled substances will be "ongoing." He bases this contention on his participation in substance abuse treatment while he was incarcerated. Father also notes that he completed his case plan while incarcerated and argues, citing *In re Doe*, 142 Idaho 594, 130 P.3d 1132 (2006) and *Idaho Dep't of Health & Welfare v. Doe*, 150 Idaho 752, 250 P.3d 803 (Ct. App. 2011), that the magistrate erred by focusing on his past criminal record while disregarding his case plan compliance and substance abuse treatment progress made during his period of retained jurisdiction.

The magistrate considered Father's evidence, noting that Father testified about the intensity of the programming he received and that he now can recognize his triggers that lead to drug abuse. The magistrate further found that Father had telephoned the children regularly while incarcerated and that he participated in education classes. However, the magistrate found that, as Father himself admitted, he actively used methamphetamine from the time his oldest child was born until his latest incarceration in June 2010, that Father had received many previous opportunities to address his drug abuse problem through treatment while not incarcerated but did not take advantage of those opportunities, and that the only time Father was not using

9

methamphetamine was when he was incarcerated. Accordingly, the magistrate found that, under the totality of the circumstances, it was "highly speculative and highly unlikely" that Father was going to stop using methamphetamine and, therefore, it was probable that he would again be imprisoned in the future. The magistrate further said that although Father stated that he now intended to remain sober and felt ready to live life without crime and without extensive incarceration, the magistrate doubted his sincerity and credibility and found that he was "not worthy of trust." The magistrate's findings of neglect, that Father's ability to provide stable, consistent parental care for the children was impaired because of his historic and ongoing use of controlled substances and because of his historic and ongoing periods of incarceration, are supported by substantial and competent evidence.

Mother makes arguments similar to those of Father. She contends that while she was imprisoned on her rider she received substance abuse assessments and completed several programs including relapse prevention. Mother also focuses on her own testimony that there was a period between the two CPA cases when she was not using and did not commit any new crimes. Mother asserts that upon her release she now has a plan to stay clean, sober, and out of jail by attending twelve-step meetings and other programming. Mother contends that the magistrate erred by ignoring, or at least not discussing, this evidence. *See State, Dep't of Health & Welfare v. Doe III*, 149 Idaho 409, 414, 234 P.3d 733, 738 (2010) (a CPA parental termination trial court may not ignore relevant and admissible evidence of factors that the legislature has deemed relevant); *In re Adoption of Doe*, 143 Idaho 188, 192, 141 P.3d 1057, 1061 (2006) (same).

Contrary to Mother's assertions on appeal, however, the magistrate did not ignore this evidence. The magistrate stated that Mother "testified that her prison term, this time, is different due to the 'programming' she is attending," that Mother now "thinks she is prepared to learn how to safely parent," and that Mother "says she was clean for about five years after her first prison sentence." The magistrate found, however, that Mother's historic use of illegal drugs and periodic incarceration in the first child protective case had continued to the present. Mother's probation officer described her as "one of the worst addicts" she had ever supervised. The magistrate found that given all the evidence, including Mother's frequent positive urinalysis tests during a seven-year period beginning at the birth of Girl and continuing through the present case, and Mother's frequent refusal to undergo testing during this CPA case, her uncorroborated claim

10

of a five-year period of sobriety during this time was "questionable," and that her "self-reporting [of methamphetamine use] is inconsistent and likely not trustworthy." The magistrate further said that although Mother stated that she now intended to remain sober and felt ready to live life without crime and without extensive incarceration, the magistrate doubted her sincerity and credibility and found that she was "not worthy of trust." The magistrate further found that:

> [Mother and Father's] criminal history from 2004 is so extensive and so abnormal given the number of offenses, probation violations and failures to appear that it is notable. The frequent incarceration due to criminal activity is undisputed. That the parents of these children were able to stop their drug use only when imprisoned is also not in dispute.

The magistrate's findings of neglect, that Mother's ability to provide stable, consistent parental care for the children was impaired because of her historic and ongoing use of controlled substances and because of her historic and ongoing periods of incarceration, are supported by substantial and competent evidence.

**B.      Substantial, Competent Evidence Supports the Magistrate's Findings that Termination of Mother and Father's Parent-child Relationships Is in the Best Interests of the Children**

Both Mother and Father challenge the magistrate's findings that termination is in the best interests of the children. Father largely repeats the arguments that we have addressed above-- that he is now prepared to live drug and incarceration free and is thus newly capable to parent the children and that the magistrate failed to assign sufficient weight to his efforts in "programming" while he was in prison. Father adds that he believes the magistrate erred by making an impermissible subjective determination that the Doe's family life was not "normal." Mother makes no specific assertion of magistrate error, but instead cites her own trial testimony to the effect that she worries about the mental and emotional effects that termination of her parental rights might have on her children, worries about them suffering from separation, abandonment, and bonding issues should this occur, and does not believe that termination is in the children's best interests. Mother also references the testimony of the initial foster mother to Boy I and Boy II to the effect that she believed termination of parental rights as to Boy I would be detrimental to him.

Based upon largely undisputed testimony of the foster father and Department workers, the magistrate's findings on this issue include the following. At the time of termination, Boy I was eleven years old and had resided with Mother for only five and one-half of those years, Girl

was six years old and had resided with Mother for only nineteen months, Boy II was five years old and had resided with Mother for only three years, and Boy III was one and one-half years old and had resided with Mother for only three months. The children spent the remainder of the time in foster care in the first CPA case and in the instant CPA case, or in guardianship with Father's brother. The magistrate found that during the children's time in Mother's custody she was, when not incarcerated, essentially a single parent and the alleged caregiver because Father did not live with the family on a regular basis, and "there is no evidence that [Father] has ever willingly, regularly, and competently been a full time caregiver or consistent provider for any of the children." Mother largely relied upon Boy I to care and provide for his younger siblings while she was away from the home abusing drugs as "[t]his child felt responsible to keep this highly dysfunctional family together because his parents could not." The magistrate found that the children had never known security, permanence, or stability from a parent in their lives. Instead, Mother and Father were more like regular visitors than parents.

A Department worker said that when the children came into care they were dirty and had head lice, that each of the three eldest children suffered from emotional, mental, and behavioral problems and from dental neglect. The three children had little social training and fought with each other constantly, which was noted by the magistrate to be "consistent with [Mother's] anger, behavior, comments and blaming." Each of the three eldest children has attachment issues and has been diagnosed with adjustment disorder and/or reactive attachment disorder resulting from, according to the magistrate's findings, "multiple caregivers and no permanency, no faith in their future and no security." The magistrate found that the children "are very confused and struggle with why they are in care at all" and "fear for their future." All three were in therapy or treatment of some sort to address their behavioral problems, and the foster parents worked with the children to improve their social skills and behavior. By the time of trial, each child was performing well in school and enjoyed opportunities to participate in sports, scouting, and other extracurricular activities.

A Department worker said that when then-three-month-old Boy III was taken into care, the back of his head was flattened and covered with a rash from excessively lying on his back

12

unattended in his crib. The Department worker and Boy III's foster father[2] said that it was discovered that the child also suffered from asthma and gastrointestinal problems and that the child's condition required frequent doctor visits, coordinated and attended by the foster parents. Boy III's condition was life-threatening, requiring multiple hospital visits and constant vigilance and attention by the foster parents, especially in the winter months. Boy III has also received regular physical therapy to address the flatness of his head and to improve his gross motor skills, which continued to be seriously delayed. The magistrate found that Mother was apparently unaware of Boy III's asthma as her house smelled strongly of cigarette smoke and, as the magistrate found, "[t]here is no evidence [Mother] provided any medical intervention for this child."

The foster father said that caring for these children is a full-time job, that he and his wife split up the many appointments, counseling sessions, school extracurricular activities, homework, and basic need responsibilities, and that the household was like a "non-stop whirlwind." Accordingly, the magistrate found:

> These kids need parents with an extraordinary level of patience, and who [can] demonstrate their ability to parent extremely high needs kids. These children need parents who have educated themselves about attachment disorders and the bonding issues of children who have been chronically neglected and diagnosed [with] reactive attachment disorder and/or adjustment disorders and what those diagnoses require from a caregiver.
> These children are not "normal" children whose significant issues can just be ignored, as these parents prefer to do. These children need parents who are able to handle the stress of the dynamics these kids present with and these kids need stable parents and a supportive environment. These kids need parents who are willing to educate themselves for the ongoing challenges these kids present. The challenges are significant. The kids need parents who can coordinate all the services each of the children needs, identify additional needs and then line up sources to meet their individual needs. They need parents who have the love, devotion and energy to do the hard work to try to normalize these children. They need parents who are attentive twenty four hours a day, seven days a week. They need committed parents willing to work long hours with these children.

---

[2] This foster father and his wife parented and cared for Girl and Boy III from July 2010 through the last day of trial on October 27, 2011. A different foster family parented Boy I and Boy II from July 2010 to July 2011, at which time they were transferred to the care of the first foster family.

The magistrate concluded that Mother and Father were not qualified to be these parents, and concluded from Mother's and Father's testimony that both were generally oblivious to the harm they had done to their children through conduct and neglect. The magistrate said:

> It is of note to this Court that the on-going ability and desire of these parents to continue to minimize the chronic neglect of these children throughout their lives, is distressing.
>
> It is as if these children's lives have no value. It is as if the chronic neglectful environment these parents created for all these children did not exist. Because these parents feel like they are "ready" to be clean, they expect the Court is to ignore the extensive, documented and uncontroverted lengthy history of the chronic neglect of all of these children. The abject disconnect between the parents' "hopes" for the future and the denial of their children's profound needs for safety and permanency is also notable. On some level it is as if the parents are emotionally stunted due to their chronic methamphetamine use. It is also likely that the pervasive use of methamphetamine may well impact the thinking processes of [Mother] and [Father]. This would give some answer to how these parents might actually think they are fit to try to learn how to parent these children after seven years of documented neglect. Rather than even admitting the damage they have inflicted on these children throughout their lives, these parents selfishly believe they are entitled to maintain their rights because they are momentarily not using drugs. These parents will not make a causal connection between their drug use and the chronic neglect of the children throughout their lives.

The magistrate concluded:

> It is this Court's conclusion that the evidence is not conflicting. Neglect has been clearly established. It is in these children's individual best interests to be allowed to be free from the neglect these parents cannot or will not admit.
>
> . . . .
>
> The non-compliance with the current Case Plan is consistent with the non-compliance with the first case involving only [Boy I] and [Girl]. It is heart breaking that these "parents" produced two more children to subject to chronic neglect. [Mother] was given the opportunity to prove she had changed when she convinced a Canyon County Judge to dissolve the guardianship. She did not take advantage of that opportunity. Neither did [Father]. Both of them simply returned to their established behaviors and continued to neglect these children until they were caught again. These parents do not accept that these children are damaged because of their decision to neglect them for as long and as consistently as they have.
>
> These "parents" do not deserve any more chances. The risk is too great for these children.

This opinion repeats only a small portion of the magistrate court's thorough, thoughtful, and comprehensive discussion of the evidence presented, and its conclusions flowing therefrom.

Having carefully reviewed the entirety of the record and evidence presented at trial, we find that the magistrate's conclusion that termination of Mother's and Father's parental rights was in the children's best interests to be supported by substantial, competent evidence.

## IV.

## CONCLUSION

The magistrate court's judgment terminating Mother's and Father's parent-child relationships with the children is affirmed.

Judge GUTIERREZ and Judge MELANSON **CONCUR.**