IN THE COURT OF APPEALS OF THE STATE OF IDAHO
Docket No. 40786

IN THE MATTER OF THE )
TERMINATION OF THE PARENTAL )
RIGHTS OF JOHN (2013-07) DOE. )
IDAHO DEPARTMENT OF HEALTH & ) 2013 Unpublished Opinion No. 598
WELFARE, )
 ) Filed: July 26, 2013
        Petitioner-Respondent, )
 ) Stephen W. Kenyon, Clerk
v. )
 ) THIS IS AN UNPUBLISHED
JOHN (2013-07) DOE, ) OPINION AND SHALL NOT
 ) BE CITED AS AUTHORITY
        Respondent-Appellant. )
 )

Appeal from the Magistrate Division of the District Court of the Fourth Judicial District, State of Idaho, Ada County. Hon. Cathleen MacGregor-Irby, Magistrate.

Decree terminating parental rights, affirmed.

Davis & Walker; Layne Davis, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Mary J. Beig, Deputy Attorney General, Boise, for respondent.

_____

LANSING, Judge

John Doe ("Father") challenges the termination of his parental rights and contends the magistrate court did not comply with the Indian Child Welfare Act regarding placement of the child. We affirm.

## I.

## BACKGROUND

Father's daughter ("Child") was born in January 2006. Like her mother, Child is a member of the Cherokee Nation. Father is not a Native American. In March of 2010, Father was incarcerated for felony domestic battery. On March 23, 2010, Mother was also arrested on charges of domestic violence and injury to a child. At that time, the home where Child was living was extremely dirty, had no bedding, and had no heat. Because both of Child's parents

were incarcerated, law enforcement declared Child to be in imminent danger, and a petition for hearing under the Child Protective Act ("CPA") was filed. The petition included Child and Child's four older siblings. It was later amended to include Child's younger sibling who was born after the CPA case began, and who tested positive for methamphetamine at birth. (Father is not the parent of any of Child's siblings.)

The magistrate court found that the children were in imminent danger, and placed them in the custody of the Department of Health and Welfare ("DHW"), which began efforts to reunite the children with their mother and the children's respective fathers. The court also notified the Cherokee Nation of the CPA proceedings.

When the CPA case began, Father was not listed on Child's birth certificate. After his paternity was established in August 2010, DHW filed an amended petition under the CPA alleging that Child was neglected because Father was incarcerated and subject to an order for no contact with Child, which made him unable to provide proper care and control of Child. In October 2010, Father stipulated that Child had been neglected and came within CPA jurisdiction.

Father has been incarcerated for the entirety of these CPA proceedings, and the circumstances that led to his current incarceration are relevant to the termination proceedings. Father is currently serving a prison sentence for domestic battery in the presence of children for an incident that occurred on June 25, 2009. At 4 a.m. on that date, police received a report of domestic violence. A 911 call recorded most of the confrontation. During the episode, Father pushed Mother onto the bed and strangled her. As Mother struggled, Father grabbed her by the hair and hit her in the face. When Father's eight-year-old stepson came to Mother's aid, Father dragged him by the neck and arm and threw him onto the bed also. Father then picked up a pillowcase and told his stepson "I'm going to kill you." During the altercation, Father accused his wife of sleeping around and using drugs. Throughout the recording, children can be heard screaming and crying in the background. Responding officers not only saw evidence of the struggle on both Mother and the stepson, but also found Oxycontin and methamphetamine at the home. Father later admitted pulling his wife's hair, pushing her into a wall, and hitting her one or two times in the face. He also admitted to grabbing his stepson.

Father pleaded guilty to domestic battery in the presence of children, and the State dropped multiple associated drug possession charges, and charges for attempted strangulation, resisting and obstructing officers, and injury to children. Before sentencing, the court ordered

2

mental health and domestic violence evaluations. These found, respectively, that: Father had an anger problem, depressive disorder, and polysubstance abuse concerns; and, "[Father] had an extremely high risk of violence against his spouse and other members of the community at large." At the same time Father pleaded guilty, a no-contact order was put in place under which Father was and remains prohibited from any contact with Child, Mother, or any of Child's siblings until December 30, 2029. After the no-contact order was issued, Father violated it three times, with the last violation being a felony.

To this point, Father has been incarcerated for four of Child's seven years of life. Father was serving a unified twenty-year sentence with five years fixed for the felony domestic battery. His subsequent felony conviction for violating the no-contact order added another unified sentence of six years with one and one-half years fixed. Father's earliest possible parole date is near the end of 2014, although if required to serve his entire term, Father will not be released until 2034.

Although DHW undertook efforts toward reunification of Mother with her children,[1] these efforts were unsuccessful. In May 2011, DHW filed a petition to terminate the parental rights of both parents. Mother chose not to contest the termination petition, and her parental rights therefore were terminated by default. In January 2013, a trial was conducted on the petition to terminate Father's rights. At the conclusion of the trial, the magistrate court terminated Father's rights on findings that he would likely be incarcerated for a substantial portion of Child's minority, and that termination of his parental rights would be in Child's best interest.

During the pendency of the CPA proceedings, Child had been placed with a non-relative foster family, and although Father asked the court to place Child with her paternal grandparents, that was not ordered and DHW chose not to place Child with the grandparents.

On appeal, Father argues that the magistrate court's finding that termination was in the best interest of Child was not supported by the trial evidence, and that the Indian Child Welfare Act was violated by the court's failure to place Child with the paternal grandparents.

---

[1]    It was not possible to pursue reunification with Father because Father was incarcerated and because a no-contact order prohibited him from any contact with Child.

## II.

## ANALYSIS

A parent's interest in maintaining a relationship with his or her child is a fundamental liberty interest protected by the Fourteenth Amendment of the United States Constitution. *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *Quilloin v. Walcott*, 434 U.S. 246, 255-56 (1978). *See also In re Doe*, 146 Idaho 759, 761, 203 P.3d 689, 691 (2009). In concord, the Idaho Legislature has directed "that the state of Idaho shall, to the fullest extent possible, seek to preserve, protect, enhance and reunite the family relationship." Idaho Code § 16-1601. In similar recognition of the fundamental rights involved, the Termination of Parent and Child Relationship Act, states that "[i]mplicit in this chapter is the philosophy that wherever possible family life should be strengthened and preserved." I.C. § 16-2001(2). Also pertinent to this case is the Indian Child Welfare Act, 25 U.S.C.A. § 1901, *et seq.* (ICWA), which was enacted to address the high incidence of removal of Indian children from their Indian families and tribes and the placement of these children in homes outside of their extended families, tribes, and cultures. 25 U.S.C.A. §§ 1901, 1902.

Both the CPA and the ICWA contain formalities required for the termination of parental rights. Idaho Code Section 16-2005 permits the Department to petition the court for termination of the parent-child relationship when it is in the child's best interest and any one of the following five factors exist: (a) abandonment; (b) neglect or abuse; (c) lack of a biological relationship between the child and a presumptive parent; (d) the parent is unable to discharge parental responsibilities for a prolonged period that will be injurious to the health, morals, or well-being of the child; or (e) the parent is incarcerated and will remain incarcerated for a substantial period of time. Each statutory ground is an independent basis for termination. *State v. Doe*, 144 Idaho 839, 842, 172 P.3d 1114, 1117 (2007).

Because a fundamental liberty interest is at stake, the United States Supreme Court has determined that a court may terminate a parent-child relationship only if that decision is supported by "clear and convincing evidence." *Santosky*, 455 U.S. at 746. *See also* I.C. § 16-2009; *Doe*, 146 Idaho at 761-62, 203 P.3d at 691-92; *State v. Doe*, 143 Idaho 383, 386, 146 P.3d 649, 652 (2006). As such, on appeal from a decision terminating parental rights pursuant to the CPA, due process requires this Court to determine whether the trial court's decision to terminate is supported by substantial and competent evidence, which means such evidence as a reasonable

4

mind might accept as adequate to support a conclusion. *Doe v. Doe*, 148 Idaho 243, 245-46, 220 P.3d 1062, 1064-65 (2009). The appellate court will indulge all reasonable inferences in support of the trial court's judgment when reviewing an order that parental rights be terminated. *Id.* The Idaho Supreme Court has also said, however, that the substantial evidence test requires a greater quantum of evidence in cases where the trial court's finding must be supported by clear and convincing evidence than in cases where a mere preponderance is required. *In re Doe*, 143 Idaho 343, 346, 144 P.3d 597, 600 (2006). Further, the magistrate's decision must be supported by objectively supportable grounds. *Id.* We conduct an independent review of the record that was before the magistrate court. *Id.*

When a child is of Native American heritage, the ICWA provides that a court may terminate a parent-child relationship only if the court makes an additional finding, "supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody by the parent . . . is likely to result in serious emotional or physical damage to the child." 25 U.S.C.A. § 1912(f). Beyond requiring additional proof of injury to the child, the ICWA also provides a number of specific procedural safeguards that must be met in proceedings for termination of parental rights. These include requirements that the notice of the proceeding be given to the child's parents or Indian custodian, and that there be "active efforts . . . to provide remedial services and rehabilitative programs." 25 U.S.C.A. § 1912(a), and (d). The ICWA provides that a parent, Indian custodian, or the child's tribal community can petition the court to enforce these protective safeguards, *see* 25 U.S.C.A. § 1914, and that an Indian custodian or tribe can intervene at any point in the proceeding. *Id*. at § 1911(c). Additionally, Section 1915 mandates that unless there is good cause to the contrary, a child's foster placement or adoptive placement should be with one of the preferred groups referenced in the statute.

On appeal from a termination governed by the ICWA, we will uphold the magistrate's finding if there was substantial evidence from which a rational trier of fact could have reached its conclusion beyond a reasonable doubt. *Idaho Dep't of Health & Welfare v. Doe*, 152 Idaho 797, 802, 275 P.3d 23, 28 (Ct. App 2012). We conduct an independent review of the record that was before the magistrate. *Doe*, 143 Idaho at 346, 144 P.3d at 600. The appellate court will indulge all reasonable inferences in support of the trial court's judgment when reviewing an order that parental rights be terminated. *Doe*, 148 Idaho at 245-46, 220 P.3d at 1064-65. Whether the trial

court correctly applied the ICWA to the facts of this case is a question of law and is subject to free review by this Court. *In re Doe*, 127 Idaho 452, 458, 902 P.2d 477, 483 (1995).

On appeal, Father raises two issues, one asserting that the magistrate court did not satisfy state law standards, and one asserting a violation of the ICWA.

## A. Best Interest of the Child

Father does not contest the magistrate court's finding that he is incarcerated and will likely remain incarcerated for a substantial period of Child's minority. He contends, however, that the trial evidence does not support the magistrate court's finding that termination of Father's parental rights was in the best interest of Child. Notably, he contends only that the evidence does not support this element under state law standards and does not challenge the magistrate court's finding, as required by the ICWA, that continued custody by the parent "is likely to result in serious emotional or physical damage to the child." 25 U.S.C.A. § 1912(f). Although he frames the issue as whether there is sufficient evidence to support the finding that termination is in the best interest of Child, the argument in Father's brief barely mentions Child's interest. Rather, he asks the Court to consider the realities of his incarceration when considering the quality of his contacts or efforts to keep a meaningful relationship with Child. He points out that a court-imposed no-contact order prevented him from building a meaningful relationship with Child, which he asserts was not properly considered by the magistrate. He then argues that although he was not able to create a relationship with Child, his relatives, including his mother and father, have formed a familial relationship that is severed by the termination of his parental rights. He argues that the magistrate erred in not considering the severance of this bond with Father's family, which could have been preserved by giving the grandparents guardianship of Child instead of terminating Father's rights. Father does not, however, address the sufficiency of the evidence upon which the magistrate actually relied for its holding that termination would be in Child's best interest.

When a parent is incarcerated, a trial court can consider a number of factors to determine if termination is in the child's best interest. *Doe*, 152 Idaho at 803, 275 P.3d at 29. Included in these factors are the time the parent has spent with the child; prior criminal behavior, whether charged or uncharged; previous incarceration or rehabilitation; the nature and circumstances of the offense leading to incarceration; and the impact of the parent's incarceration on the child's mental, physical, and social well-being. *Id.* Considering these factors, the court should keep in

6

mind the totality of the evidence before it. *See Idaho Dep't of Health & Welfare v. Doe*, 152 Idaho 644, 649-50, 273 P.3d 685, 690-91 (2012); *In re Doe*, 149 Idaho 564, 568, 237 P.3d 661, 665 (Ct. App. 2010).

Contrary to Father's argument, the magistrate specifically considered the effect of the no-contact order. Referring to Father's continued efforts to violate the no-contact order, the court found that Father's behavior showed an "inability to follow court orders, continued criminal thinking and violent criminal behavior." The court had ample evidence of Father's unwillingness to comply with the no-contact order. Prison reports in evidence recount how Father violated the no-contact order by calling Mother, trying to get his parents to contact Mother in violation of the no-contact order, and sending letters through third parties. Perhaps the most disturbing evidence before the court was a recorded phone call that Father made from prison. During the conversation he repeatedly urged his parents to persuade Mother to hide and not to testify against him. Then a child's voice--presumably one of Father's other children--interrupts the adults' conversation to recount to Father how she had called Mother to try and fulfill Father's wishes, but that the conversation had not gone well.

The magistrate here heard ample testimony to assess Child's best interest. Child's therapist testified that Child suffered from complex or developmental trauma, which is akin to post-traumatic stress disorder. The therapist testified about Child's dissociative freeze response when confronted by "anything that reminds [her] of her past." The therapist said that in order to cope with the trauma Child had faced, she would "stop and freeze and be invisible as much as possible, and hopefully . . . disappear enough where nothing bad w[ould] happen." The mere mention of Father triggered that response. Even at the time of trial Child was unable to fully process the traumatic memories. Child's Guardian ad Litem testified that Child had formed a strong bond with her foster family and was thriving in their care. He said that she was ahead of her peers in school. After listening to hours of recorded conversations between Father and his mother, the Guardian was "deeply concerned about [Father]'s perception of women and whether he has any respect for women." The Guardian further testified that this attitude would become detrimental as Child develops through her teenage years.

Additionally, an expert on the Cherokee tribal community testified that "the tribe does not feel that [Father] is a viable option for reunification" because he is not scheduled for release until 2029. The court had also heard testimony that "[Father] . . . doesn't take responsibility for

7

any of his actions." And that in the tribe's opinion, Child "should not have to be unsure of her future. She deserves a family." The evidentiary record firmly supports the magistrate court's finding that termination of Father's parental rights was in the best interest of Child.

**B.      The Magistrate Properly Applied the ICWA**

On appeal, Father also argues that the magistrate failed to comply with the ICWA by not placing Child with Child's paternal grandparents upon terminating Father's parental rights.

We start by noting that Father has not persuaded the Court that the ICWA gives him a basis to challenge the magistrate's placement. The ICWA provides very specific protections in state court proceedings. For example, it creates the right of intervention for an "Indian child, the Indian custodian of the child and the Indian child's tribe." 25 U.S.C.A. § 1911(c). Section 1915, governing placement, specifies that "[w]here appropriate" parental input about the child's placement "shall be considered." *Id.* at § 1915(c). Parents are given a right to challenge certain state court actions under Section 1914, which provides the ability to challenge a court's violation of §§ 1911, 1912, or 1913. Section 1914 states:

> Any Indian child who is the subject of any action for foster care placement or termination of parental rights under State law, any parent or Indian custodian from whose custody such child was removed, and the Indian child's tribe may petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provision of sections 1911, 1912, and 1913 of this title.

25 U.S.C.A. § 1914. Notably, however, Section 1914 does not provide that a parent may petition to invalidate a placement decision that is alleged to violate the Section 1915 preferences. Father has not presented any authority indicating that he has standing to dispute Child's placement after termination of his parental rights.

Assuming arguendo that Father *presently* has the right to challenge the magistrate's application of Section 1915, we hold that the magistrate's variance from the established placement preference order is supported by good cause in this case.

Section 1915 of the ICWA specifies a hierarchy of preferences for placement of children following removal from the home. It states, in part:

> (a) Adoptive placements; preferences
> In any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families.

8

(b) Foster care or preadoptive placements; criteria; preferences
Any child accepted for foster care or preadoptive placement shall be placed in the least restrictive setting which most approximates a family and in which his special needs, if any, may be met. The child shall also be placed within reasonable proximity to his or her home, taking into account any special needs of the child. In any foster care or preadoptive placement, a preference shall be given, in the absence of good cause to the contrary, to a placement with--

> (i) a member of the Indian child's extended family;
> (ii) a foster home licensed, approved, or specified by the Indian child's tribe;
> (iii) an Indian foster home licensed or approved by an authorized non-Indian Licensing authority; or
> (iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs.

25 U.S.C.A. § 1915(a), (b). Thus, placement or adoption by a member of the child's extended family is preferred over any alternative placement. These placement preferences embody the ICWA's underlying policy that, if possible, the child should remain with the child's historical community. *In re Doe*, 127 Idaho at 461, 902 P.2d at 486. However, the preference order is not immutable; the statute expressly allows the court to vary from the preference order when there is good cause to do so. 25 U.S.C. § 1915(a), (b).

The Idaho Supreme Court has noted that the term "good cause" was intended to give the trial court flexibility in placing children under the ICWA. *Doe*, 127 Idaho at 461, 902 P.2d at 486. In light of that intended flexibility, our Supreme Court held that the trial court's determination of good cause would not be overturned absent an abuse of discretion. *Id.* When a trial court's discretionary decision is reviewed on appeal, the appellate court conducts a multi-tiered inquiry to determine: (1) whether the lower court correctly perceived the issue as one of discretion; (2) whether the lower court acted within the boundaries of such discretion and consistently with any legal standards applicable to the specific choices before it; and (3) whether the lower court reached its decision by an exercise of reason. *Id*. at 461-62, 902 P.2d at 486-87.

A placement hearing was conducted in March 2011 at which the magistrate court considered whether Child should remain in the foster home where she had been residing or should be placed with her paternal grandparents, as Father requested. The court elected to leave Child in the foster home and approved termination and adoption as the permanency plan. Father thereafter filed a motion for reconsideration of the permanency plan, and another hearing was

conducted in November 2011 at which the court again addressed the placement issue. The court denied Father's motion to modify. Upon subsequent termination of Father's parental rights, the court left Child in the legal custody of the Department, without any directive to change the prior placement or require further consideration of Father's parents as potential adoptive parents for Child.

Although Father acknowledges that the ICWA allows a deviation from the preference established when there is good cause, Father argues that in this case the evidence was insufficient to establish good cause to deviate from the order established in the ICWA. We disagree.

At the placement hearing, a tribal expert testified that the tribe approved departure from the ICWA preference order for child placement and recommended against placement of Child with her paternal grandparents for a number of reasons. These included: a fear that they would allow Father, who has a very violent history, to have contact with Child; and that such a placement would separate Child from her siblings with whom she is strongly bonded and some of whom reside in the same foster family with Child. According to a report from the tribe that was placed in evidence, the Cherokee Nation was concerned that if Child was placed with the paternal grandparents, the foster families of her other siblings would not wish for their foster children to maintain sibling contact with Child because of the history of the paternal grandparents and "statements made" by Child's siblings regarding the grandparents. This comment was apparently a reference to evidence elsewhere in the record that these siblings had reported that they were abused by the grandparents when they resided with them. The expert said that "the tribe was adamant" that Child and her siblings be kept together even if it meant placing them in a non-ICWA preferred home. The expert also relayed concerns that if Child were placed with the grandparents, "the other [foster] families [would] not wish to maintain [the] sibling bond because of the history of the paternal grandparents."

After they were placed in foster care, several of Child's siblings told their caretakers that the grandparents had abused them and expressed overt favoritism. A caseworker reported that when one of the siblings was asked if Child should be placed with their grandparents, "he reacted so emotionally" that the caseworker asked grandmother about postponing an upcoming visit with the child in Idaho.

Although Child's grandmother denied these allegations, her testimony was contradicted by other evidence. For example, grandmother testified that she only used "timeout" to punish

the children, but a Florida child abuse investigation report recounted an incident where grandmother had "spanked [one of Child's sibling] after getting frustrated . . . [which left] a large red mark on her butt and her lower back." The Florida report also mentions one of Child's brothers having "marks in the past that he indicated were the result of his grandmother beating him."

A Permanency Committee report also expressed concern that the grandparents denied or condoned Father's violent behavior. In one report, the committee observed that the grandparents "accept no responsibility on behalf of themselves or their son . . . for past actions . . . [and] do not feel there is any need for protection for the children from their son." The DHW caseworker testified that the paternal grandparents' attitude was that Father has "done nothing wrong." This attitude is evidenced in Florida child protection reports which show that after the grandparents obtained legal custody of two of Father's other children, the grandparents repeatedly allowed those two children to return to Father's home in spite of that state's continued concerns about his abuse and neglect of the children. Mother also testified that the paternal grandmother attempted to convince Mother not to testify against Father in the criminal proceedings against him.

There was also evidence that the grandmother was engaged in prescription drug abuse. Mother testified at the permanency hearing that she was introduced to prescription drug abuse by her mother-in-law. Mother testified that after Father was released from prison in 2006, he was extremely violent. She testified that after she (Mother) was physically injured by Father, the grandmother would give prescription painkillers to Mother to keep her from going to the hospital. This developed over time until the two would "go doctor hunting . . . to get the pain pills." Extended family members also "expressed concerns to the case managers about [grandmother's] prescription drug abuse." Although grandmother testified to the contrary, the magistrate found her testimony to lack credibility; and that she "appeared to want to do or say whatever was necessary to appease the DHW." In contrast to the negative information about the grandparents' conduct, the court received evidence that Child was doing very well with her foster family. The foster mother has a master's degree in psychology and has experience working with children with special needs. The foster father is a police officer with experience working with troubled teens. The foster parents made a point of exposing Child, and her siblings who lived in the same foster family, to the Cherokee Tribe and its culture.

11

The magistrate court ultimately accepted the tribal expert's recommendation and opinion that placement with the grandparents was unsuitable. The magistrate found "good cause to deviate from the ICWA preferences." On the record before us, it appears clear that the magistrate understood its discretion in determining good cause to vary from the preferences of the ICWA. The magistrate relied on the expert testimony about the tribe's wishes, together with other evidence that the paternal grandparents' home was not a suitable placement for Child. The record shows that the magistrate court's findings are supported by substantial and competent evidence in the record, including the recommendations of the affected Indian tribe. The magistrate court acted within the scope of its discretion and consistent with governing law, including the ICWA, and reached its decision by an exercise of reason. Therefore, we find no abuse of discretion.

## III.

## CONCLUSION

The magistrate court's decree terminating the parental rights of Father is affirmed. No costs or attorney fees on appeal.

Chief Judge GUTIERREZ and Judge MELANSON **CONCUR.**

12