## IN THE SUPREME COURT OF THE STATE OF IDAHO
### Docket No. 44174/44175

IN THE MATTER OF JANE DOE and JOHN DOE, Minor Children.

-----------------------------------------------------------

STATE OF IDAHO, DEPARTMENT OF HEALTH & WELFARE,

    Petitioner-Respondent,

v.

JANE DOE I (2016-17),

    Respondent-Appellant,

and

GUARDIAN AD LITEM / CASA,

    Intervenor-Respondent.

Boise, August 2016 Term

2016 Opinion No. 95

Filed: September 12, 2016

Stephen W. Kenyon, Clerk

IN THE MATTER OF JANE DOE and JOHN DOE, Minor Children.

-----------------------------------------------------------

STATE OF IDAHO, DEPARTMENT OF HEALTH & WELFARE,

    Petitioner-Respondent,

v.

JOHN DOE I (2016-18),

    Respondent-Appellant,

and

GUARDIAN AD LITEM / CASA,

    Intervenor-Respondent.

Appeal from the District Court of the Second Judicial District, State of Idaho, Latah County. Hon. Stephen L. Calhoun, Magistrate Judge.

Magistrate court judgment terminating parental rights, _affirmed._

McCormick Law Office, and Kovis Law Office, Moscow, for appellants.

1

Attorneys Northwest, Inc., Coeur d'Alene, for respondents.

Hon. Lawrence G. Wasden, Idaho Attorney General, Boise, for respondent.

_____

BURDICK, Justice

## I.    NATURE OF THE CASE

Jane Doe I (Mother) and John Doe I (Father) each appeal the Latah County magistrate court's judgment terminating their parental rights as to their two minor children, L.W. and J.W. Mother argues the magistrate court erred in several respects, including that it wrongfully terminated her parental rights because the State's petition for termination was not filed in accordance with Idaho law and because the children had not been in Idaho Department of Health and Welfare (IDHW) custody for a mandatory period of fifteen months before the petition was filed. Mother also argues that the magistrate erred in finding that the children were neglected; that it was in the Mother's best interests to have her parental rights terminated; and that Mother was unable to discharge her parental responsibilities. Father incorporates Mother's arguments on appeal into his own appeal, and additionally argues that the court erred in determining that Father was unable to discharge his parental responsibilities. We affirm.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

The events giving rise to this case began on November 3, 2013, when police responded to a medical emergency at Mother and Father's trailer house. At that time, the trailer house was occupied by Mother; Father; their daughter L.W., who was one year and ten months old at the time; and a vulnerable adult who was deceased. It was later determined that the vulnerable adult's death was the result of neglect and malnutrition while in the care of Mother and Father.[1] Officer David Hathaway, who responded to the medical emergency, testified that the vulnerable adult was emaciated; had matted dirt in his hair, around his neck, and in the creases of his skin; his nails were overgrown, filthy and appeared to be severely infected with fungus; he had multiple bed sores; and his back appeared to be one large continuous bed sore.

As to the condition of the house, the officer testified that there was an overwhelming smell from the garbage that was strewn throughout the house; the carpet and bedding were filthy; there was aged food and plastic containers containing urine surrounding the bed; and there were

---

[1] The autopsy report revealed that the cause of death was prolonged protein/calorie malnutrition.

empty food and drink containers on the floor next to the bed, along with an ashtray overrun with cigarette butts. The vulnerable adult's room had an overwhelming smell of ammonia. As a result of the poor condition of the home, the Moscow Police Department referred the case to IDHW, which investigated the issue. Mother assured IDHW that she would clean the house. The house was timely cleaned and the IDHW closed the investigation at that time.

Nearly nine months later, on July 17, 2014, Officer Hathaway returned to the home to serve arrest warrants on Mother and Father relating to the neglect of the vulnerable adult found in November of 2013. At that time, officers learned that Mother and Father had a second child, a two week old boy named J.W. Thus, there were two minor children residing in the home with Mother and Father: L.W., who was two-and-a-half years old, and J.W., an infant. In his probable cause affidavit, the officer noted the following condition of the home:

> The trailer was found in similar conditions as it was in November 2013. . . . Inside there was old food on the floors of every room. There were stains on the floors, tables and couches throughout the house. All of the windows were covered by blankets and/or sheets making it very dark inside. The back bedroom, which was [L.W.'s] bedroom, had toys and clothes covering the majority of the floor. Also in [L.W.'s] room, was a large amount of feces smeared on nearly everything. There was feces on the floor, door, doorknob, walls, clothes on the floor, toys on the floor, and on [L.W.'s] bed and blankets. It appeared the feces was the result of more than one bowel movement, based on the quantity, and it appeared it had been there a long time longer than something that had recently occurred (It was dried, hardened, and no longer smelled strongly like fresh feces).

The officer further observed that L.W. and her clothes were dirty and that she was grunting and screaming and had no verbal or communication skills. Officers removed two dogs from the home because they were emaciated and starving. Based on the officer's observations, he was concerned for the children and their well-being. After the parents' arrest, Father's brother cared for the children. However, they became too much for him to handle. The brother testified that L.W. was wild, non-verbal, out of control, would scream, and could not sit at the table and eat. As to J.W., the brother testified that he was stiff and would not make eye contact. Based on his experiences, the brother opined that the children had not been nurtured and were untrained and undisciplined.

Four days later, on July 21, 2014, the children were declared in imminent danger and were removed from Mother's care and placed in foster care. The foster parent testified that during visitations, Mother and Father would allow L.W. to run around without correction and were unable to set safe and healthy boundaries. Additionally, the weekly visits took a toll on the

3

children—they would be exhausted, J.W. had diarrhea and L.W. would have fits, some lasting as long as two hours.

The State filed a petition under the Child Protective Act on July 22, 2014, requesting the court to determine that the children were within the jurisdiction of the Act and that they should continue in shelter care. On July 23, 2014, the magistrate court entered a shelter care order, wherein, based upon the stipulation of the parties, the court held that the children were within the jurisdiction of the Child Protective Act due to a lack of a stable home environment. The court set an adjudicatory hearing for the State's petition for August 20, 2014, and ruled that it was in the best interests of the children to vest legal custody in IDHW pending that adjudicatory hearing.

On August 14, 2014, an adjudicatory/disposition report of investigation was filed with the court. In that report, an IDHW case worker recommended that the children remain in the custody of IDHW. On August 20, 2014, following the adjudicatory hearing, the court entered an order granting legal custody to IDHW based upon the stipulation of the parties and upon the investigation report that was prepared by the IDHW case worker. The court ordered IDHW to prepare a case plan and scheduled a hearing for October 1, 2014, to review the case plan.

Later, the foster parent for the children testified that J.W. would not make eye contact and that she had to work hard at behavior issues with J.W. The foster parent testified that J.W. did not like being held and would stiffen up when held. Additionally, the back of J.W.'s head was flat, which indicated that he had spent most of the time lying on his back and not being held. As to L.W., the foster parent described her as being feral with no language skills, and that L.W. would throw tantrums and fits as a result of her frustration from not being able to communicate her needs or express her feelings. Additionally, L.W. would pick food out of the trash and eat it, she could not sit at the table to eat, and she would eat like an animal, picking food apart, lifting it up to her face to smell it and look at the foster parent first before nibbling on it. L.W. had no potty training, and would smear feces all over everything. L.W. would not play with her peers at daycare. Finally, L.W. would scream and panic when doors were shut, even if there were people she knew in the room. L.W. was significantly delayed in the development of her speech and social interactions.

The children were then placed with a new foster family on August 21, 2014. The new foster parent testified, consistent with the first foster parent's testimony, that J.W. was very stiff when held, did not make eye contact, and that his head was flat and square. The foster parent

4

additionally testified that J.W. "had a weird desire to be in his car seat all the time," and that he did not like to be held. As to L.W., the new foster parent testified that she could not talk at all, and that she screamed a lot and would throw herself on the ground, push other kids, and scratch. She would pick through her food and smell everything before she would eat it and continued to eat out of the garbage can, and would also try to eat out of the sink. She was not potty trained and continued to smear feces everywhere. The new foster parent also testified that after visitations with Mother and Father, L.W. would be very upset, would scream more, often had a fever, and refused to say words that she already knew. The new foster parent testified that with proper attention, it only took a week to potty train L.W., and that L.W. began receiving special services to aid in her development, during which L.W. exhibited significant progression.

A case plan consisting of a service plan and an alternative care plan was filed on September 22, 2014, which required the parents to complete several tasks in an effort to reunify the parents with the children. The tasks included, among others: (1) maintaining a safe and stable home for the children that was free from safety hazards, including feces, moldy dishes and food, and small items on the floor; (2) cooperating with announced and unannounced home visits by IDHW; (3) attending parenting classes; and (4) completing psychological evaluations. The magistrate court approved the case plan at a hearing on October 15, 2014.

The IDHW social worker assigned to the case made several efforts to assist Mother and Father in completing the case plan. The social worker set up various appointments for Mother and Father; made them calendars every month with important dates, appointments, and other reminders; and scheduled parenting classes for them. Both Mother and Father failed to follow through on several appointments, in particular, the mental health appointments and the parenting classes. In fact, the social worker testified that although there was no set number of parenting classes Mother and Father were required to take under the case plan, they each only attended a handful of sessions. Mother could have attended classes once a week for the eleven months the children were in IDHW's custody prior to her incarceration. However, she only attended seven classes out of the fifty-two available. As to Father, he could have attended classes once a week for eight months prior to his incarceration, but only attended three.

On March 16, 2015, Father entered a plea to the felony charge of Principal to Neglect of a Vulnerable Adult. Father was subsequently sentenced to ten years in prison with a minimum period of confinement for three years. Father is still in prison with his first possible parole date in

5

March of 2018, which will be two years from the date of his parental rights being terminated and four years since the children were removed from his care. Shortly thereafter, on April 13, 2015, Mother pled guilty to the felony charge of Principal to Exploitation of a Vulnerable Adult and was sentenced to eight years in prison. However, after completing her rider program, Mother's sentence was suspended and she was placed on probation for a period of six years. Prior to the incarceration of Mother and Father, they had failed to complete the case plan. The social worker assigned to their case testified that they had both had ample time and opportunity to complete the case plan prior to their incarceration.

On July 10, 2015, IDHW submitted a plan for permanency for the children to the court. On July 15, 2015, the court held a permanency hearing to review the State's recommendations for permanency. Mother and Father did not attend the hearing due to their incarceration, but they were represented by legal counsel. On August 6, 2015, the court entered an order approving a permanent plan for termination of parental rights and adoption and also ordered that reunification efforts between the children and parents cease.

On August 4, 2015, the State filed a petition to terminate parental rights on the grounds that Mother and Father "have failed to comply with the court's orders in a child protective case or the case plan, and reunification of the children with their parents has not occurred as set forth in Chapter 20, Title 16, Idaho Code." The State claimed that termination was in the children's best interests. Although represented by counsel, Mother and Father did not file an answer to the petition denying the State's allegations.

From February 22 to February 23, 2016, the court held a two-day trial on the termination petition. At the time of the trial, the children had been in IDHW custody for nineteen months. Following the trial, the magistrate court issued its findings on April 27, 2016, wherein it terminated Mother's and Father's parental rights to L.W. and J.W. The magistrate court found that clear and convincing evidence from trial proved that (1) Mother and Father neglected L.W. and J.W.; (2) Mother and Father were unable to discharge their parental responsibilities; (3) Father would be incarcerated for a substantial period of time; and (4) it was in the children's best interest to terminate the parent/child relationship. The magistrate court entered a judgment on April 27, 2016 to reflect these findings and conclusions. Mother filed a notice of appeal on May 5, 2015, and Father filed a notice of appeal on May 9, 2015. For judicial economy, this Court consolidated the two cases on appeal.

6

### III.    ISSUES ON APPEAL

1. Whether the magistrate court erred in terminating Mother's and Father's parental rights when the petition for termination was filed before the order for permanency was entered.

2. Whether the magistrate court erred in terminating Mother's and Father's parental rights when the children had not been in IDHW's custody for fifteen months before the petition was filed.

3. Whether substantial and competent evidence supports the magistrate court's decision to terminate Mother's and Father's parental rights.

### IV.    STANDARD OF REVIEW

The IDHW must show grounds for termination of parental rights by clear and convincing evidence because each parent has a fundamental liberty interest in maintaining a relationship with his or her child. *Idaho Dep't Health & Welfare v. Doe*, 150 Idaho 36, 41, 244 P.3d 180, 185 (2010). Clear and convincing evidence is evidence that indicates the thing to be proved is highly probable or reasonably certain. *Id.*

On appeal, we will not disturb the magistrate court's decision to terminate parental rights if there is substantial, competent evidence in the record to support the decision. *Id.* Substantial, competent evidence is evidence that a reasonable mind might accept as adequate to support a conclusion. *Id.* This Court is required to independently review the magistrate court's record, but must draw all reasonable inferences in favor of the magistrate court's judgment because the magistrate observed witness demeanor, assessed credibility, detected prejudice or motive, and judged the parties' character. *Id.*

### V.    ANALYSIS

Mother and Father make several arguments on appeal as to why the magistrate court erred in terminating their parental rights. First, Mother and Father argue that the magistrate court wrongfully terminated their parental rights because the petition was not filed in accordance with Idaho Code section 16-1624(2). Second, Mother and Father argue that the court erred in terminating their rights because their children had not been in IDHW custody for fifteen months before the petition was filed as required by Idaho law. Mother's and Father's remaining arguments will be discussed together under one heading, as they all deal with whether substantial

and competent evidence supported various findings the magistrate court made. We address each issue in turn below.[2]

## A. A permanency order is not a prerequisite to filing a petition for termination of parental rights.

Mother and Father argue that the petition for termination was filed in contravention of Idaho Code section 16-1624(2) and that this Court should dismiss the petition on those grounds. Specifically, Mother and Father argue that a petition for termination may not be filed until after the court enters a permanency hearing order.

Idaho Code section 16-1624(1) provides:

> If the child has been placed in the legal custody of the department or under its protective supervision pursuant to section 16-1619, Idaho Code, the department may petition the court for termination of the parent and child relationship in accordance with chapter 20, title 16, Idaho Code. A petition to terminate parental rights shall be filed in the child protective act case.

Idaho Code section 16-1624(2) then provides that "a petition to terminate parental rights shall be filed within thirty (30) days of an order approving a permanency plan with a permanency goal of termination of parental rights and adoption."

There is nothing in Idaho Code section 16-1624(1) or (2) that requires a court to enter a permanency order before a termination petition may be filed. Idaho Code section 16-1624(1) makes clear that a petition for termination may be filed if the child has been placed in the legal custody of IDHW, and does not restrict when the petition may be filed. Likewise, there is nothing in Chapter 20, Title 16 of the Idaho Code that requires a court to enter an order of permanency before a petition for termination may be filed. Idaho Code section 16-1624(2) merely requires a termination petition to be filed within thirty days of the court entering a permanency order with a permanency goal of termination of parental rights. Idaho Code section 16-1624(2) merely establishes what must occur after a court enters a permanency order with a goal of termination—that being that a petition for termination must be filed within thirty days. Thus, there is nothing in that provision that limits the State's authority to file a petition for termination under Idaho Code section 16-1624(1) or otherwise require a permanency order to be filed before a petition for termination may be filed.

---

[2] The Court notes that there was never any objection filed prior to the termination hearing that the petition was premature or defective in any way. Therefore, IDHW and the magistrate judge had to deal with these issues post-hearing.

The fact that the State is not required to wait for a twelve month permanency order before filing a termination petition is illustrated by Idaho Juvenile Rule 48(a), which states:

> At any time after the entry of a decree finding that the child is within the jurisdiction of the court under the C.P.A. a petition for termination of the parent-child relationship may be filed in accordance with the provisions of I.C. § 16-1624 and Chapter 20, Title 16, of the Idaho Code.

I.J.R. 48(a). Thus, IDHW may file a petition for termination any time after an adjudicatory hearing finding that the child comes within the purview of the Child Protective Act. A court is not required to enter a permanency order before a petition for termination can be filed. Here, the children had been in IDHW custody for twelve months prior to the filing of the petition for termination of parental rights. Therefore, the State had the authority to file a petition for termination of parental rights. Therefore, Mother's and Father's argument fails.

## B. Idaho law does not require a child to be in the custody of IDHW for fifteen months before the State may file a petition for termination of parental rights.

Mother and Father argue that the magistrate court erred in terminating their parental rights because the children had not been in IDHW custody for fifteen months prior to the date the petition for termination was filed as required by Idaho law. Mother and Father essentially argue that a prerequisite for a finding of neglect is that IDHW had temporary or legal custody of the children for fifteen of the most recent twenty-two months, and in this case, IDHW only had custody of the children for approximately twelve months when the petition was filed. Mother's and Father's argument is without merit.

The magistrate court found that Mother and Father had neglected the children, which was one of the grounds for terminating their parental rights. Idaho Code section 16-2005(1)(b) provides that parental rights may be terminated if the parent has neglected the child. Idaho Code section 16-2002 defines "neglected" as:

> (a) Conduct as defined in section 16-1602(28), Idaho Code; **or**

> (b) The parent(s) has failed to comply with the court's orders or the case plan in a child protective act case and:

>> (i) The department has had temporary or legal custody of the child for fifteen (15) of the most recent twenty-two (22) months; and

>> (ii) Reunification has not been accomplished by the last day of the fifteenth month in which the child has been in the temporary or legal custody of the department.

I.C. § 16-2002(3). Idaho Code section 16-1602, in turn, defines "neglected" as:

9

(a) Who is without proper parental care and control, or subsistence, medical or other care or control necessary for his well-being because of the conduct or omission of his parents, guardian or other custodian or their neglect or refusal to provide them; however, no child whose parent or guardian chooses for such child treatment by prayers through spiritual means alone in lieu of medical treatment shall be deemed for that reason alone to be neglected or lack parental care necessary for his health and well-being, but this subsection shall not prevent the court from acting pursuant to section 16-1627, Idaho Code; or

(b) Whose parents, guardian or other custodian are unable to discharge their responsibilities to and for the child and, as a result of such inability, the child lacks the parental care necessary for his health, safety or well-being; or

(c) Who has been placed for care or adoption in violation of law; or

(d) Who is without proper education because of the failure to comply with section 33-202, Idaho Code.

I.C. § 16-1602(28).[3]

This Court has pointed out that Idaho Code section 16-2002(3)(a) and (b) are written in the disjunctive and there is no requirement that a magistrate court consider the statutory time frame of fifteen months in custody when it makes a finding of neglect based on subsection (a) alone. *In re Doe*, 151 Idaho 356, 363-64, 256 P.3d 764 771-72 (2011). Mother and Father's argument is based on the premise that the magistrate court found neglect under Idaho Code section 16-2002(3)(b)(i), when in fact, the magistrate court did not. In this case, the magistrate court's judgment makes clear that the court relied on the definition of neglect under Idaho Code section 16-2002(3)(a), which points to the definition of neglect under Idaho Code section 16-1602(28). This is evident because the magistrate court, under the heading "pertinent law," outlined Idaho Code section 16-1602(28) and its definition of neglect. This clearly demonstrates that the magistrate court relied on Idaho Code section 16-2002(3)(a) and Idaho Code section 16-1602(28) in determining that Mother and Father neglected their children. Nowhere did the magistrate judge refer to Idaho Code section 16-2002(3)(b), which sets forth the fifteen-month custody requirement. Because the magistrate court relied on the definition of neglect under Idaho Code section 16-2002(3)(a) and Idaho Code section 16-1602(28), the court was not required to consider the statutory time frame of fifteen months in custody when it made the finding of

---

[3] This section has since been renumbered and is now found under Idaho Code section 16-1602(31).

neglect. Thus, the magistrate court did not err in that regard and Mother's and Father's argument fails.[4]

**C. Substantial and competent evidence supports the magistrate court's findings.**

Finally, Mother and Father argue that several of the magistrate court's findings were not supported by substantial and competent evidence. Specifically, Mother and Father challenge the following findings: (1) that the children had been neglected; (2) that it was in Mother's best interest to terminate her parental rights; and (3) that Mother and Father are unable to discharge their parental responsibilities and will continue to be unable for a prolonged indeterminate period of time. Each of these findings are independent statutory grounds for termination, and a finding of any one of them is a sufficient basis upon which to terminate parental rights. *Idaho Dep't of Health & Welfare v. Doe*, No. 44010-2016, 2016 WL 3974548, at *4 (Idaho July 22, 2016).

First, Mother and Father argue that the magistrate court erred in finding that the children were neglected. They point to evidence in the record to show the contrary, and argue that the court incorrectly focused on events prior to intervention in reaching its conclusion.

As discussed above, the magistrate court relied upon Idaho Code section 16-1602(28)'s definition of neglect, which defines neglect as a child:

> (a) Who is without proper parental care and control, or subsistence, medical or other care or control necessary for his well-being because of the conduct or omission of his parents, guardian or other custodian or their neglect or refusal to provide them; . . . . or

> (b) Whose parents, guardian or other custodian are unable to discharge their responsibilities to and for the child and, as a result of such inability, the child lacks the parental care necessary for his health, safety or well-being; . . . .

The magistrate court considered facts throughout the duration of the case, including pre-intervention, to conclude that the children had been neglected. In fact, the magistrate court listed three pages of facts to support its conclusion that the children were neglected. Specifically, the court focused on the deplorable condition of the home in both November of 2013 and July of 2014, and the fact that a vulnerable adult had passed away under Mother's and Father's care. Additionally, the court highlighted J.W.'s attachment issues, and L.W.'s delayed development, which included the fact that although she was three-and-a-half years old, she was functioning at the level of a two-year old—she was described as feral, could not speak, ate like an animal, could

---

[4] As a side note, by the time the order of termination had been filed the children had been in IDWH custody for fifteen months.

not interact with other children, and was otherwise way behind emotionally and socially. The court noted that the mental health counselor testified that these deficits were environmental rather than biological.

The court also focused on the lack of effort of Mother and Father in completing the case plan prior to being incarcerated. The court noted that Mother and Father had ample time to complete the case plan prior to being incarcerated, but failed to do so. Mother completed only seven parenting classes over a period of eleven months, whereas Father completed only three classes over an eight-month period. The court noted that although Mother completed a parenting class in prison, she only did so more than four months after the State had moved to terminate her parental rights. Both parents were offered mental health and other services through IDHW, but neither of them took advantage of those services. Finally, both Mother and Father refused to participate in Family Group Decision Making Process until June and July of 2015, after the case was almost a year old.

The court acknowledged that the parents attended most visitations, but noted that although they would attend visitations, they were unable to set safe and healthy boundaries and spent much of their time complaining about IDHW and accusing IDHW of providing inadequate care to their children. The court noted that the parents' visits had a negative impact on the children—the children were always exhausted, L.W. would throw fits, and J.W. would often have a fever.

Finally, the court noted that Mother and Father lost their home due to being incarcerated and that Father will be in prison for at least two years. As to Father, the court reasoned that he was

> incapable of providing a safe and stable home prior to going to prison and did little to improve his abilities prior to going to prison. His work history was spotty before going to prison and it is an unfortunate fact the [sic] having been in prison does not increase one's ability to find good employment. . . . It is this Court's opinion that even after [Father's] release from prison in at least two years it would not be safe to return the children to his care and custody without extensive counseling, education, and observation to insure that he had developed adequate skills and responsibility to adequately and safely parent these children.

As to Mother, the court reasoned:

> At the time the court ordered reunification efforts cease on the 2nd day of July 2015 the children had been in state custody for approximately eleven (11) moths and (11) days. Assuming all that time [Mother] would be released at six (6) months, which was what ultimately happened the children would have been in

12

State custody for approximately seventeen (17) months and 11 days and the children would not have been returned to her at that time. She would still have to fulfill the requirements of the case plan before reunification. Finishing the case plan, if possible at all, is likely to be a lengthy process given her lack of progress earlier, her mental health issues, her low intellectual functioning and the children's father being incarcerated for at least two (2) more years.

Based on the facts it illustrated and on the foregoing reasoning, the court concluded that the children had been neglected.

Mother's and Father argue that it was improper for the court to focus so much on the facts prior to intervention. However, this Court has held that

the [magistrate] court has broad discretion in determining what evidence is too remote. Certainly the prior history of the family before the State's intervention as well as conditions which exist at intervention are admissible to prove the underlying allegation supporting termination. Current conditions may be admissible, subject to evidentiary standards and judicial discretion, to show any number of issues. These could include continued neglect, abuse or abandonment or mitigating issues that may call for more rehabilitative measures short of termination. It can never be argued current conditions are all that may be examined by the magistrate court in making its decisions.

*State v. Doe*, 144 Idaho 839, 843, 172 P.3d 1114, 1118 (2007). Thus, it was not error for the magistrate court to consider facts prior to intervention in its finding of neglect.

Mother and Father's remaining arguments essentially ask this Court to disregard the function of the trial court—weighing the evidence. However, it is well established that appellate courts in Idaho do not re-weigh evidence. *Id.* at 842, 172 P.3d at 1117. Instead, this Court defers to the trial court's unique ability to "accurately weigh the evidence and judge the demeanor of the witnesses" and take into account the trial court's "superior view of the entire situation." *Id*. Moreover, magistrate courts have "broad discretion in determining whether evidence is or is not too remote" to be relevant to a termination action. *Id.* There is no indication in the magistrate court's judgment and findings that it disregarded the positive efforts Mother and Father have made to reunify with their children. Instead, the court considered the evidence before it and exercised its discretion and reached the conclusion that the children had been neglected. We hold that the facts the court relied on were substantial and competent evidence to support a finding of neglect. Because we affirm the magistrate court's finding of neglect, we do not address the magistrate court's alternative bases for terminating Mother's and Father's parental rights.

## VI.  CONCLUSION

We affirm the magistrate court's decision terminating Mother's and Father's parental rights to L.W. and J.W. and award costs on appeal to Respondent IDHW.

Chief Justice J. JONES and Justices EISMANN, W. JONES and HORTON, **CONCUR.**